# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| NTD I LLC, ) | |
| NORTH TOWER DEVELOPMENT, LLC, and ) | |
| PAUL WEISMANN, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Case No. 4:16-cv-1246 |
| v. ) | |
| ) | JURY TRIAL DEMANDED |
| ALLIANT ASSET MANAGEMENT COMPANY, LLC, ) | |
| ALLIANT CAPITAL, LTD., ) | |
| ALLIANT CREDIT FACILITY, LTD., ) | |
| ALLIANT CREDIT FACILITY ALP, LLC, ) | |
| ALLIANT TAX CREDIT FUND 36, LTD., and ) | |
| ALLIANT TAX CREDIT 36, LLC, ) | |
| ) | |
| Defendants. ) | |

## VERIFIED COMPLAINT AND JURY DEMAND

NTD I, LLC (the "General Partner"), North Tower Development, LLC (the "Developer"), and Paul Weismann ("Weismann," and together with the General Partner, and the Developer, the "Plaintiffs"), by way of their *Verified Complaint and Jury Demand* (the "Complaint") against Alliant Asset Management Company, LLC ("Asset Management"), Alliant Capital, Ltd. ("Capital"), Alliant Credit Facility, Ltd. ("Credit Facility"), Alliant Credit Facility ALP, LLC ("Credit Facility ALP"), Alliant Tax Credit Fund 36, Ltd. ("Fund 36 Ltd."), and Alliant Tax Credit 36, LLC ("Fund 36 LLC," and together with Fund 36 Ltd., the "Limited Partners"), hereby allege as follows:

### *Parties*

1.      The General Partner is a Missouri limited liability company with a registered office at 200 NE Missouri Road, Suite 298, Lees Summit, Missouri 64086.  The General Partner

is a party to an *Amended and Restated Agreement of Limited Partnership* dated July 1, 2006 (the "LPA") concerning Water Tower Place, L.P. (the "Partnership").  A true and accurate copy of the LPA is attached as <u>Exhibit A</u>.

2.      The Developer is a Missouri limited liability company with a registered office at 1422 Mississippi Avenue, Saint Louis, Missouri 63104.  The Developer is named in the LPA and is a third party beneficiary of the LPA.

3.      Weismann is a Connecticut resident.  Weismann is the sole manager and the majority member of the General Partner and the Developer.  Weismann is named in the LPA and is a third party beneficiary of the LPA.

4.      Upon information and belief, Asset Management is a California limited liability company with a registered office at 21600 Oxnard Street, Suite 1200, Woodland Hills, California 91367.  Asset Management is an Affiliate of past and present Limited Partners.[1]

5.      Upon information and belief, Capital is a Florida limited partnership with a registered office at 340 Royal Poinciana Way, Suite 305, Palm Beach, Florida 33480.  Capital is an Affiliate of past and present Limited Partners.  Alliant, Inc., a corporation formed under the laws of Florida with the same registered office, is a Capital general partner.

6.      Upon information and belief, Credit Facility is a Florida limited partnership with a registered office at 340 Royal Poinciana Way, Suite 305, Palm Beach, Florida 33480.  Until September 28, 2006 Credit Facility was an LPA party as a Limited Partner.  Credit Facility is an Affiliate of past and present Limited Partners.  Alliant, Inc. is a Credit Facility general partner.

7.      Upon information and belief, Credit Facility ALP is a Florida limited liability company with a registered office at 340 Royal Poinciana Way, Suite 305, Palm Beach, Florida

---

[1] Capitalized terms used, but not specifically defined herein shall have the definitions and meanings ascribed to those capitalized terms by the LPA.

33480.  Until September 28, 2006 Credit Facility ALP was an LPA party as a Limited Partner.  Credit Facility ALP is an Affiliate of past and present Limited Partners.  Shawn Horwitz ("Horwitz"), the Chief Executive Officer and a co-founder of Alliant (as defined herein), is the Credit Facility ALP managing member.

8.      Upon information and belief, Fund 36 Ltd. is a Florida limited partnership with a registered office at 340 Royal Poinciana Way, Suite 305, Palm Beach, Florida 33480.  Since September 28, 2006 Fund 36 Ltd. has been an LPA party as a Limited Partner.  Capital is a Fund 36 Ltd. general partner.

9.      Upon information and belief, Fund 36 LLC is a Florida limited liability company with a registered office at 340 Royal Poinciana Way, Suite 305, Palm Beach, Florida 33480.  Since September 28, 2006 Fund 36 LLC has been an LPA party as a Limited Partner.  Mr. Horwitz is the Fund 36 LLC managing member.

### *Jurisdiction and Venue*

10.     This is a civil action among citizens of different States.  There exists complete diversity of citizenship among all of the plaintiffs and all of the defendants.  The amount in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs.  This Court has original jurisdiction of this civil action pursuant to 28 U.S.C. § 1332.

11.     Certain claims asserted herein involve actual controversies within the jurisdiction of this Court for which the Plaintiffs seek a declaration of the rights and other legal relations of the parties.  This Court has jurisdiction to declare the rights and other legal relations of the parties, whether or not further relief is or could be sought, pursuant to 28 U.S.C. § 2201.

12.     This seat of this Court is in a judicial district in which a substantial part of the events and omissions giving rise to the claims asserted herein occurred, and in which a

substantial part of the property that is the subject of the action is situated, *to wit*, Water Tower Place and the LPA that governs the Partnership.  Venue in this Court and Division is proper pursuant to 28 U.S.C. §§ 1391 and 105.

*Allegations Applicable to All Claims for Relief*

**A.**     **Water Tower Place and the Parties' Roles**

13.     The Partnership was formed in 2006 to rehabilitate and operate Water Tower Place, an affordable housing apartment complex in Saint Louis, Missouri comprised of 178 residential housing units in 34 buildings ("Water Tower Place").  Water Tower Place is financed by a 2006 issuance of Multifamily Housing Revenue Bonds that provide federal and state low-income housing tax credits ("Housing Tax Credits").  Housing Tax Credit compliance is administered by the Missouri Housing Development Commission, under which Water Tower Place must rent to individuals whose family income is sixty percent (60%) or less of the area median income, as adjusted for family size.  The Partnership obtained all governmental approvals necessary for Occupancy of all units on or before October 1, 2007 (the "Completion Date").

14.     All Water Tower Place buildings have qualified for and been allocated Housing Tax Credits.  Each Water Tower Place building must meet regulatory provisions during each of fifteen (15) consecutive years to remain Housing Tax Credit qualified, which period ends with the calendar year 2020.  Housing Tax Credits are contingent on Water Tower Place maintaining occupant eligibility, and/or unit gross rent compliance, and compliance failure, or failure to timely correct noncompliance could result in Housing Tax Credit recapture plus interest.

15.     Upon information and belief, Asset Management, Capital, Credit Facility, Credit Facility ALP, and the Limited Partners are Affiliates that operate together, and/or in combination

4

under the corporate umbrella of The Alliant Company (collectively, "Alliant ").   Upon information and belief, Alliant is a privately owned finance and investment enterprise.

16.     Alliant, by and through special purpose entities ("Special Purpose Entities"), is in the business of, *inter alia*, structuring and syndicating investments in affordable rental housing projects through low-income housing tax credit programs.   Alliant, by and through Special Purpose Entities, is involved with syndication investments in 770 properties in 47 states and U.S. territories, involving in excess of $5.65 billion in investor equity, and numerous corporate tax credit funds.

17.     The primary, or sole reason for the acquisition, rehabilitation, and operation of Water Tower Place was for its Partners, primarily Alliant through the Limited Partners, to obtain Housing Tax Credits to sell to third parties.

18.     The General Partner is the Partnership's General Partner.

19.     Fund 36 LLC is the Partnership's Administrative Limited Partner.

20.     Fund 36 Ltd. is the Partnership's State Limited Partner, and its Investor Limited Partner.   The State Limited Partner receives all of the State Housing Tax Credits, and the Investor Limited Partner receives substantially all of the Federal Housing Tax Credits.   Upon information and belief, Alliant has sold, or otherwise assigned to Verizon and/or its affiliates, for valuable consideration, substantially all of the Housing Tax Credits.

21.     The Partnership ownership percentages are as follows:  (i) the General Partner, two one-hundredths of a percent (0.02%); (ii) Fund 36 Ltd. as the State Limited Partner, one one-hundredth of a percent (0.01%); (iii) Fund 36 LLC as the Administrative Limited Partner, one one-hundredth of a percent (0.01%); and (iv) Fund 36 Ltd. as the Investor Limited Partner, ninety-nine and ninety-six one-hundredths of a percent (99.96%).

22.     The Developer developed Water Tower Place pursuant to a certain *Development Services Agreement* required by the LPA (the "Development Services Agreement").  Under the LPA and the Development Services Agreement, the Developer is entitled to a Development Fee.

23.     In addition to his roles with the General Partner and the Developer, Weismann was at all relevant times a surety with respect to certain Partnership bond debt ("Bond Debt").  The Partnership commenced regularly scheduled monthly debt service payments amortizing the principal balance of long-term permanent portion of the Bond Debt on March 1, 2008 (the "Conversion Date").  The outstanding principal balance of the Bond Debt as of June 30, 2016 was approximately $3.7 million.  Weismann is also a limited surety of certain General Partner LPA obligations.

**B.     Certain LPA Rights, Benefits, Duties, and Obligations**

24.     The General Partner is responsible for overall management and control of the Partnership business, assets and affairs that, subject to certain limitations, is stated to constitute full, exclusive and complete charge of the management of the Partnership.  The General Partner has delegated day-to-day management and operation of Water Tower Place to the Management Agent.

25.     As consideration for its numerous LPA duties and obligations, the General Partner is entitled to, *inter alia*, one one-hundredth of a percent (0.01%) of the Federal Housing Tax Credits, and, under appropriate circumstances, other distributions of profits, income, and proceeds of the Partnership and its property.

26.     The General Partner is obligated to, *inter alia*, make Operating Loans to the Partnership as needed to fund Operating Deficits during the Operating Deficit Guaranty Period.

27.     The General Partner is obligated to, *inter alia*, make Capital Contributions under LPA specified circumstances for the purpose of distributing such funds to the Limited Partners as reimbursement for Housing Tax Credit Shortfalls.

28.     The General Partner's obligation to fund Operating Deficits expires and is discharged thirty-six (36) months after the date on which Water Tower Place attains Rental Achievement (the "Sunset Date").

29.     The General Partner's obligation to make Capital Contributions to fund Housing Tax Credit Shortfall payments to the Limited Partners expires and is discharged on the Sunset Date.

30.     The Administrative Limited Partner's duties include, *inter alia*, receiving and approving certain Partnership reporting, giving its consents and/or approvals on various Partnership decisions made or to be made, and exercising discretion as to certain LPA matters and terms.  By way of examples only, the Administrative Limited Partner exercises some level of consent or discretion over:  (a) the selection of the Accountants; (b) the adjustment of Asset Values; (c) tax matters and LPA issues related to Housing Tax Credits; (d) the form and substance of Partnership audits and financial statements, and state and federal tax filings; and (e) the uses of certain Capital Contributions.

31.     The LPA confers significant decision making authority, functional veto rights, and discretion to the Administrative Limited Partner concerning many material LPA terms, as well as Partnership business affairs and the management.

32.     As consideration for its LPA duties and obligations, the Administrative Limited Partner is entitled to one one-hundredth of a percent (0.01%) of the Housing Tax Credits, and,

under some circumstances, distributions of profits, income, and proceeds of the Partnership and its property.

33.     The State Limited Partner role is to receive one hundred percent (100%) of the State Housing Tax Credits, which is in consideration of it making the State Limited Partner Contributions when due under LPA Article 3.3.B.  Fund 36 Ltd., as the State Limited Partner, is also entitled to, under some circumstances, distributions of profits, income, and proceeds of the Partnership and its property.

34.     The Investor Limited Partner role is to receive ninety-nine and ninety-seven one hundredths percent (99.97%) of the Federal Housing Tax Credits, as well as ninety-nine and ninety-six one hundredths percent (99.96%) of all Losses, which benefits are in consideration of it making the Investor Limited Partner Contributions when due under LPA Article 3.4.  Fund 36 Ltd., as the Investor Limited Partner, is also entitled under the LPA to, under some circumstances, distributions of profits, income, and proceeds of the Partnership and its property. The Investor Limited Partner is also entitled to an annual Asset Management Fee after the attainment of Rental Achievement.

35.     The parties agreed in LPA Article 3.8.A. that the Investor Limited Partner Contribution and the State Limited Partner Contribution are subject to downward adjustment when Actual Housing Credits are less than Projected Housing Credits.  The parties also agreed that when Actual Housing Credits are greater than Projected Housing Credits, (a) the Investor Limited Partner Contribution and the State Limited Partner Contribution shall be adjusted upward, or (b) the Investor Limited Partner's and the State Limited Partner's Interests shall be reduced so those Limited Partners shall be in the same economic position as if the Housing Tax Credits had not increased.  The purpose and intention of that economic adjustment mechanism

was to ensure the Limited Partners did not obtain unfair windfalls without giving additional consideration, or without their Interests being reduced.

36.     Under the Development Services Agreement the Developer, *inter alia*, (a) negotiated and entered into contracts for design, engineering, consulting, and construction of Water Tower Place, (b) oversaw and managed day-to-day the construction and rehabilitation of Water Tower Place, and (c) used its best efforts to, and accomplished Completion on or before September 1, 2007.  As consideration, the Developer earned a $1,250,000.00 Development Fee, some or all of which is due and payable, but which remains unpaid, making the Developer a creditor of the Partnership.

37.     Upon a sale or liquidation of the Partnership, the sale or liquidation proceeds are to be applied and distributed in accordance with LPA Article 9.2.B.  Specifically, such proceeds are to be applied, as applicable:  first, to Partnership liabilities to other than Partners; second, to unpaid Housing Tax Credit Shortfalls; third, to unpaid Asset Management Fees; fourth, to pay interest on any loans to the Partnership by any Partners or their Affiliates; fifth, to the principal of any loans to the Partnership by any Partners or their Affiliates; and sixth, with the balance of equity funds to be distributed (a) 9.98% to the Investor Limited Partner, (b) 0.01% to the Administrative Limited Partner, (c) 0.01% to the State Limited Partner, and (d) 90% to the General Partner.

38.     Weismann is responsible for the management and control of the General Partner and the Developer.  Weismann also carried out and performed his qualified and limited obligations as surety of the General Partner for the LPA and the Bond Debt.

39.     Weismann's obligation to fund Operating Deficits as surety of the General Partner is limited to $500,000.00.  Weismann's obligation to fund Operating Deficits for any amount, as surety of the General Partner or otherwise, expires and is discharged on the Sunset Date.

40.     Weismann's obligation to make Capital Contributions to fund Housing Tax Credit Shortfall payments to the Limited Partners, as surety of the General Partner or otherwise, expires and is discharged on the Sunset Date.

41.     In exercising its LPA consent and approval authority, and in exercising its LPA discretion, the Administrative Limited Partner has an implied obligation to exercise its consent and approval authority, and its discretion in manner that is in keeping with the spirit of Partnership transactions, and in a manner that permits the Partnership, the General Partner, the Developer, and Weismann to obtain the expected benefits of their agreements.

42.     In exercising its LPA rights, performing its LPA duties, and fulfilling its LPA obligations, the State Limited Partner has an implied obligation to exercise those rights, perform those duties, and fulfil those obligations in manner that is in keeping with the spirit of Partnership transactions, and in a manner that permits the Partnership, the General Partner, the Developer, and Weismann to obtain the expected benefits of their agreements.

43.     In exercising its LPA rights, performing its LPA duties, and fulfilling its LPA obligations the Investor Limited Partner has an implied obligation to exercise those rights, perform those duties, and fulfil those obligations in manner that is in keeping with the spirit of Partnership transactions, and in a manner that permits the Partnership, the General Partner, the Developer, and Weismann to obtain the expected benefits of their agreements.

**C.      Alliant Functions as the Limited Partners**

44.     Upon information and belief, Asset Management, Capital, Credit Facility, Credit Facility ALP, Tax Credit Facility, and the Limited Partners are all Special Purpose Entities that exist, and function in combination solely to facilitate syndicated investments in affordable rental housing projects through low-income housing tax credit programs.

45.     Jeffrey A. Bachman is a Senior Vice President and the Director of Asset Management at Alliant.  Upon information and belief, Mr. Bachman is responsible for, among other functions, the oversight of the Asset Management operations platform of Alliant, including the Alliant interest in Water Tower Place.  The electronic mail address for Mr. Bachman at Alliant is jeff.bachman@alliantcapital.com.

46.     Horwitz is the Chief Executive Officer and a co-founder of Alliant.  Upon information and belief, Mr. Horwitz, who is experienced in the area of tax credit syndication, is involved in the day-to-day management and operation of Alliant and its financial affairs and those of its Affiliates and Special Purpose Entities.  Upon information and belief, Mr. Horwitz is aware of, or otherwise kept apprised of the Alliant interests in, and obligations to the Partnership. The electronic mail address for Mr. Horwitz at Alliant is shawn.horwitz@alliantcapital.com.

47.     Lisa Haddon is an Asset Manager employed by Alliant.  Upon information and belief, Ms. Haddon is responsible for, among other functions, the oversight of the Alliant interest in Water Tower Place.   The electronic mail address for Ms. Haddon at Alliant is lisa.haddon@alliantcapital.com.

48.     As part of its required LPA reporting, the General Partner and its consultants, advisors, and accountants, have corresponded with Ms. Haddon at her electronic mail address at Alliant.  As part of its required LPA reporting, the General Partner and its consultants, advisors,

and accountants, have also submitted documents and information to Alliant via the electronic mail address reporting@alliantcapital.com.

49.     Kathleen Balderrama, Esq., is General Counsel to Alliant.  The electronic mail address for Ms. Balderrama at Alliant is katie.balderrama@alliantcapital.com.  On one or more occasions, Ms. Balderrama has been included in written electronic correspondence between Alliant and the General Partner and its consultants, advisors, and accountants concerning Alliant LPA obligations.

50.     Upon information and belief, no board or officer management of the Administrative Limited Partner exists that is separate and apart from Alliant.

51.     Upon information and belief, no board or officer management of the State Limited Partner exists that is separate and apart from Alliant.

52.     Upon information and belief, no board or officer management of the Investor Limited Partner exists that is separate and apart from Alliant.

53.     Upon information and belief, the LPA discretion and rights of the Administrative Limited Partner are in actuality exercised by Alliant management and employees.

54.     Upon information and belief, the LPA decisions of the Administrative Limited Partner as to honor, fulfill, and perform its LPA obligations, or to refuse to honor, fulfill, and perform those obligations, are in actuality made by Alliant management and employees.

55.     Upon information and belief, the LPA discretion and rights of the State Limited Partner are in actuality exercised by Alliant management and employees.

56.     Upon information and belief, the LPA decisions of the State Limited Partner as to honor, fulfill, and perform its LPA obligations, or to refuse to honor, fulfill, and perform those obligations, are in actuality made by Alliant management and employees.

12

57.     Upon information and belief, the LPA discretion and rights of the Investor Limited Partner are in actuality exercised by Alliant management and employees.

58.     Upon information and belief, the LPA decisions of the Investor Limited Partner as to honor, fulfill, and perform its LPA obligations, or to refuse to honor, fulfill, and perform those obligations, are in actuality made by Alliant management and employees.

59.     On or before March 8, 2010 the Partnership, with the consent and approval of the Administrative Limited Partner, retained Sherbert Associates P.C. as the Accountants.

60.     On or after January 1, 2010 the Accountants  prepared draft financial statements, including an independent auditors report and other supplemental information for Partnership fiscal years ending on December 31, 2007 and December 31, 2008 and submitted the same to the General Partner and Alliant for review and comment.

61.     On or before March 8, 2010 Alliant, after reviewing, commenting, and at times requiring changes, accepted and approved the Accountants' finalization of the Partnership 2007 and 2008 fiscal year financial statements and auditor report (the "2007/2008 Audit Report").

62.     On or after January 1, 2010 the Accountants prepared draft financial statements, including an independent auditors report and other supplemental information for Partnership fiscal years ending on December 31, 2008 and December 31, 2009 and submitted the same to the General Partner and Alliant for review and comment.

63.     On or before May 6, 2010 Alliant, after reviewing, commenting, and at times requiring changes, accepted and approved the Accountants' finalization of the Partnership 2008 and 2009 fiscal year financial statements and auditor report (the "2008/2009 Audit Report").

64.     On or after January 1, 2011 the Accountants prepared draft financial statements, including an independent auditors report and other supplemental information for Partnership

fiscal years ending on December 31, 2009 and December 31, 2010 and submitted the same to the General Partner and Alliant for review and comment.

65.     On or before March 30, 2011 Alliant, after reviewing, commenting, and at times requiring changes, accepted and approved the Accountants' finalization of the Partnership 2009 and 2010 fiscal year financial statements and auditor report (the "2009/2010 Audit Report").

66.     On or after January 1, 2012 the Accountants prepared draft financial statements, including an independent auditors report and other supplemental information for Partnership fiscal years ending on December 31, 2010 and December 31, 2011 and submitted the same to the General Partner and Alliant for review and comment.

67.     On or before March 26, 2012 Alliant, after reviewing, commenting, and at times requiring changes, accepted and approved the Accountants' finalization of the Partnership 2010 and 2011 fiscal year financial statements and auditor report (the "2010/2011 Audit Report").

68.     On or after January 1, 2013 the Accountants prepared draft financial statements, including an independent auditors report and other supplemental information for Partnership fiscal year ending on December 31, 2012 and submitted the same to the General Partner and Alliant for review and comment.

69.     On or before July 8, 2013 Alliant, after reviewing, commenting, and at times requiring changes, accepted and approved the Accountants' finalization of the Partnership 2012 fiscal year financial statements and auditor report (the "2012 Audit Report").

70.     On or after January 1, 2014 the Accountants prepared draft financial statements, including an independent auditors report and other supplemental information for Partnership fiscal year ending on December 31, 2013 and submitted the same to the General Partner and Alliant for review and comment.

71.     On or before April 30, 2014 Alliant, after reviewing, commenting, and at times requiring changes, accepted and approved the Accountants' finalization of the Partnership 2013 fiscal year financial statements and auditor report (the "2013 Audit Report").

72.     On or after January 1, 2015 the Accountants prepared draft financial statements, including an independent auditors report and other supplemental information for Partnership fiscal years ending on December 31, 2013 and December 31, 2014 and submitted the same to the General Partner and Alliant for review and comment.

73.     On or before April 29, 2015 Alliant, after reviewing, commenting, and at times requiring changes, accepted and approved the Accountants' finalization of the Partnership 2013 and 2014 fiscal year financial statements and auditor report (the "2013/2014 Audit Report").

74.     On or after January 1, 2016 the Accountants prepared draft financial statements, including an independent auditors report and other supplemental information for Partnership fiscal years ending on December 31, 2014 and December 31, 2015 and submitted the same to the General Partner and Alliant for review and comment.

75.     On March 29, 2016 Alliant, after reviewing, commenting, and at times requiring changes, accepted and approved the Accountants' finalization of the Partnership 2014 and 2015 fiscal year financial statements and auditor report (the "2014/2015Audit Report").

76.     For each of the Partnership's fiscal year tax returns for tax years 2008 through 2015, the Accountants prepared draft state and federal tax returns and submitted the same to the General Partner and Alliant for review and comment.

77.     For each of the Partnership's fiscal year tax returns for tax years 2008 through 2015, Alliant, after reviewing, commenting, and at times requiring changes, accepted and

approved the Accountants' finalization of the Partnership's state and federal tax returns and authorized their filing by the General Partner.

78.     For each of the Partnership's operating budgets for fiscal years 2008 through 2015, the General Partner prepared proposed Partnership operating budgets and submitted the same to Alliant for review and comment.

79.     For each of the Partnership's operating budgets for fiscal years 2008 through 2015, Alliant, after reviewing, commenting, and at times requiring changes, accepted and approved a Partnership operating budget to be used at Water Tower Place.

80.     In exercising Limited Partner LPA authority to give consents and/or approvals on Partnership decisions, and in exercising Limited Partner LPA discretion on Partnership Matters, Alliant has an implied obligation to exercise that consent and approval authority, and that discretion in manner that is in keeping with the spirit of Partnership transactions, and in a manner that permits the Partnership, the General Partner, the Developer, and Weismann to obtain the expected benefits of their agreements.

81.     In exercising Limited Partner LPA rights, performing Limited Partner LPA duties, and fulfilling Limited Partner LPA obligations, Alliant has an implied obligation to exercise those rights, perform those duties, and fulfil those obligations in a manner that is in keeping with the spirit of Partnership transactions, and in a manner that permit the Partnership, the General Partner, the Developer, and Weismann to obtain the expected benefits of their agreements.

**D.     Weismann Funds the Partnership Without Assistance While Alliant Profits.**

82.     In 2008, and due to the Water Tower Place Cash Flow being inadequate to fully fund Expenditures, which resulted in Operating Deficits, it was necessary for the General Partner to make Operating Loans totalling $200,000.00, all of which Weismann funded, to permit Water Tower Place to remain compliant and to create Housing Tax Credits.  Weismann funded the

16

foregoing Operating Loans in performance of his limited surety obligations for the General Partner under the LPA.

83.     In 2010, and due to the Water Tower Place Operating Deficits, it was necessary for the General Partner to make Operating Loans totalling $660,000.00, all of which Weismann funded, to permit Water Tower Place to remain compliant and to create Housing Tax Credits. Weismann funded the foregoing Operating Loans in performance of his limited surety obligations on both the Bond Debt and for the General Partner under the LPA.

84.     Weismann's funding of Operating Deficits through his funding of General Partner Operating Loans in an amount exceeding $500,000.00 discharged his surety obligations with respect to General Partner Operating Loans to fund Operating Deficits under the LPA.

85.     In 2011, and due to the Water Tower Place Operating Deficits, it was necessary for the General Partner to make Operating Loans totalling $797,238.00, all of which Weismann funded, to permit Water Tower Place to remain compliant and to create Housing Tax Credits. Weismann funded the foregoing Operating Loans in performance of his limited surety obligations on the Bond Debt.

86.     In 2012 Water Tower Place again incurred Operating Deficits, making it necessary for the General Partner to make Operating Loans totalling $325,509.00, all of which Weismann funded, to permit Water Tower Place to remain compliant and to create Housing Tax Credits.  Weismann funded the foregoing Operating Loans in performance of his surety limited obligations on the Bond Debt.

87.     In 2013 Water Tower Place continued to incur Operating Deficits, making it necessary for the General Partner to make Operating Loans totalling $173,219.00, all of which Weismann funded, to permit Water Tower Place to remain compliant and to create Housing Tax

Credits.  Weismann funded the foregoing Operating Loans in performance of his limited surety obligations on the Bond Debt.

88.     In 2014 Water Tower Place continued to incur Operating Deficits, making it necessary for the General Partner to make Operating Loans totalling $131,912.00, all of which Weismann funded, to permit Water Tower Place to remain compliant and to create Housing Tax Credits.  Weismann funded the foregoing Operating Loans in performance of his limited surety obligations on the Bond Debt.

89.     In 2015 Water Tower Place again incurred Operating Deficits, making it necessary for the General Partner to make Operating Loans totalling $151,405.00, all of which Weismann funded, to permit Water Tower Place to remain compliant and to create Housing Tax Credits.  Weismann funded the foregoing Operating Loans in performance of his limited surety obligations on the Bond Debt.

90.     As a result of having made the Operating Loans to the Partnership, the General Partner and Weismann are each creditors of the Partnership.

91.     Despite Weismann living up to and fulfilling his surety obligations, Alliant stood by and watched – and profited – when it unequivocally knew the Partnership was suffering from a shortage of operating capital.  As stated in the 2007/2008 Audit Report reviewed and approved by Alliant, Water Tower Place incurred tax losses of $647,475.00 and $236,927.00 in 2008 and 2007, respectively.   Alliant further knew that the inadequacy of the Partnership's cash flow caused the Partnership to have outstanding payables greater than one year, and required the General Partner to make Operating Loans.  The Accountants noted that uncertainty existed about the Partnership's ability to continue as a going concern.

92.     Likewise the 2008/2009 Audit Report, the 2009/2010 Audit Report, the 2010/2011Audit Report, and the 2012 Audit Report also put Alliant on actual notice that the Partnership continued to starve of operating capital.  The Partnership reported tax losses of $476,217.00 in 2009, $179,868.00 in 2010, $432,175.00 in 2011, and $674,106.00 in 2012.  By December 31, 2012 the General Partner had made Operating Loans totalling $1,982,747.00, funded by Weismann, to provide Water Tower Place with the capital it needed to operate so Water Tower Place could remain tax credit compliant, and continue to create Housing Tax Credits.  In each of the foregoing audit reports the Accountants again noted uncertainty about the Partnership's ability to continue as a going concern.

93.     In 2013, 2014, and 2015, Alliant knew the Partnership was still suffering from inadequate operating capital.  The Partnership reported tax losses of $559,705.00 in 2013, $559,601.00 in 2014, and $647,495.00 in 2015.  By December 31, 2015 the General Partner had made Operating Loans totalling $2,439,283.00, funded by Weismann, to keep Water Tower Place in compliance and generating Housing Tax Credits.  By that same date, Alliant had funded only $5 million of its $6.2 million Capital Contributions, all with actual knowledge of the Accountants' most recent going concern statement about the Partnership.  In sharp contrast, by December 31, 2015 Alliant had received the direct benefits of more than $8 million in Housing Tax Credits, and more than $4.4 million of Partnership Losses, for a then-total of Alliant benefits exceeding $12 million.

**E.     The Partnership Satisfies All Conditions for Final Capital Contributions**

94.     The State Limited Partner is obligated under the LPA to make the State Limited Partner Contributions upon the satisfaction of certain conditions, and the Investor Limited

Partner is obligated under the LPA to make the Investor Limited Partner Contributions upon the satisfaction of certain conditions.

95.     The outstanding and unpaid State Limited Partner Contributions required by LPA Articles 3.3.B.(vii) and 3.3.B(viii), are, subject to possible adjustments, $59,000.00 and $231,291.00, respectively.

96.     The outstanding and unpaid Investor Limited Partner Contributions required by LPA Articles 3.4.G. and 3.4.H, are, subject to possible adjustments, $147,000.00 and $578,474.00, respectively.

97.     With respect to the conditions for the State Limited Partner Contribution payable under LPA Article 3.3.B.(vii) in the amount of $59,000.00, that contribution is payable upon the last to occur of (a) satisfaction of all conditions precedent to the payment set forth in LPA Articles 3.3.B.(i), (ii), (iii), (iv), (v), and (vi); (b) attainment of the Rental Achievement Test; and (c) November 1, 2008.  Condition (c) has been satisfied by the passage of time.

98.     Each of the conditions set forth in LPA Articles 3.3.B.(i), (ii), (iii), (iv), (v), and (vi) occurred and/or were satisfied on or before December 31, 2008.  Upon the satisfaction of those conditions, the State Limited Partner paid the State Limited Partner Contributions due under LPA Articles 3.3.B.(i), (ii), (iii), (iv), (v), and (vi), in a total amount, after adjustments, of $1,345,374.00.   Accordingly, the LPA Article 3.3.B.(vii)(a) condition occurred and/or is satisfied.

99.     Under the LPA, Rental Achievement is defined to mean "the date that all of the following conditions have been fulfilled:   (i) Conversion; (ii) all governmental approvals necessary for Occupancy of all units in the Apartment Complex have been obtained; and (iii) one hundred percent (100%) Occupancy of the Tax Credit Apartment Units and ninety percent (90%)

Occupancy of the Apartment Complex has occurred during each of three (3) consecutive months (but no earlier than the three (3) consecutive months immediately preceding Conversion), and which produces a Debt Service Coverage Ratio of 1.15 to 1.00 for each of such three (3) consecutive months."

100.    Conversion occurred on the Conversion Date, and all governmental approvals necessary for Occupancy of all units were obtained by the Completion Date.

101.    The Rental Achievement Test is defined to mean "the satisfaction of a level of Occupancy sustained for a period of three (3) consecutive months with actual rent levels and operating expenses which produce a Debt Service Coverage Ratio of 1.15 to 1.00 with respect to all projected permanent financing for each of such three (3) consecutive months."

102.    Occupancy means "lawful occupancy of apartment units in [Water Tower Place] under leases (i) having a term of not less than six months, (ii) under which full rental payments have commenced at rental rates which are (in the case of the Tax Credit Apartment Units) consistent with the definition of "rent restricted unit" under Section 42(g)(2) of the Code, or at such lower rental rates as may be prescribed under any applicable restrictions contained in the Project Documents, but in no event at rates which are less than ninety percent (90%) of the maximum rents which can be charged to tenants of rent restricted units under Section 42(g)(2) (unless any Project Document prescribes a lower rent, in which case at rates which are less than ninety percent (90%) of such lower rents), (iii) to tenants actually occupying the apartment unit other than on a transient basis and who (in the case of the Tax Credit Apartment Units) meet the income requirements of Section 42(g) of the Code and the Project Documents, and (iv) on such other terms as are commercially reasonable and customary under residential apartment leasing practices observed in the area in which the Apartment Complex is located. An apartment unit

21

shall not be considered "Occupied" unless and until each of the foregoing criteria has been complied with. At the election of the Administrative Limited Partner, Occupancy may be certified by an internal audit or by independent accountants selected by the Administrative Limited Partner. "Occupancy" at a specified percentage means Occupancy of the specified percentage of the total number of apartment units in the Apartment Complex."

103.    Debt Service Coverage Ratio means "for any month, the ratio of operating Cash Flow to must-pay debt service, as determined by the Accountants for the Apartment Complex. For purposes of this definition, operating Cash Flow for any month shall be determined as the excess of (i) Cash Receipts over (ii) all Expenditures of the Partnership (including required reserve deposits) other than required principal and interest payments on the loans and fees or expenditures to be paid from Capital Contributions. For purposes of determining operating Cash Flow, the Expenditures of the Partnership described in clause (ii) of the preceding sentence shall be determined by taking the sum of all of the Partnership's actual Expenditures for the current and all prior months of the Fiscal Year and all anticipated Expenditures for the remainder of the Fiscal Year and allocating the sum of such actual or anticipated Expenditures ratably over the twelve months of the Fiscal Year. Debt service for any month shall be determined as the payments of principal and interest required to be made under the Mortgage Loans, other than payments to be made from Capital Contributions."

104.    In October 2013, November 2013, and December 2013 Water Tower Place had a total of 178 apartment units available for Occupancy.  On or about January 27, 2014, the Accountants determined, using the Water Tower Place Rent Roll Detail, that during each of October 2013, November 2013, and December 2013, 164 Water Tower Place apartment units were Occupied, and 14 apartment units were vacant.  The Accountants then divided the number

of Occupied apartment units in October 2013, November 2013, and December 2013 by the total number of apartment units to arrive at a 92% Occupancy percentage for each of those three successive months.

105.    As of December 31, 2013 one hundred percent (100%) of the Water Tower Place apartment units constituted Tax Credit Apartment Units that qualified for Tax Housing Credits for each of at least three (3) consecutive months, *to wit*, at least October 2013, November 2013, and December 2013, because one hundred percent (100%) of the Water Tower Place apartment units had on, and prior to December 31, 2013 been rented to, and had been Occupied by one or more Housing Tax Credit qualified tenants since the Completion Date.

106.    As of December 31, 2013 Water Tower Place attained more than ninety percent (90%) Occupancy of the Water Tower Place apartment units for each of three (3) consecutive months, *to wit*, October 2013, November 2013, and December 2013.

107.    The October 2013 Partnership financial records reflected that it had Cash Receipts of $160,790.00, and Expenditures of $63,514.00.  On or about January 27, 2014, the Accountants computed from Partnership financial records that in October 2103 the Partnership had Cash Flow of $43,276.00, and must-pay Bond Debt of $25,394.00.  The Accountants then computed the October 2013 Debt Service Coverage Ratio by dividing the October 2013 Cash Flow ($43,276.00) by the October 2013 must-pay Bond Debt ($25,394.00), to arrive at an October 2013 Debt Service Coverage Ratio of 1.70 to 1.00.

108.    The November 2013 Partnership financial records reflected that it had Cash Receipts of $158,470.00, and Expenditures of $63,514.00.  On or about January 27, 2014, the Accountants computed from Partnership financial records that in November 2013 the Partnership had Cash Flow of $94,956.00, and must-pay Bond Debt of $25,394.00.  The Accountants then

computed the November 2013 Debt Service Coverage Ratio by dividing the November 2013 Cash Flow ($94,956.00) by the November 2013 must-pay Bond Debt ($25,394.00), to arrive at an November 2013 Debt Service Coverage Ratio of 3.74 to 1.00.

109.    The December 2013 Partnership financial records reflected that it had Cash Receipts of $105,434.00, and Expenditures of $63,514.00.  On or about January 27, 2014, the Accountants computed from Partnership financial records that in December 2013 the Partnership had Cash Flow of $41,920.00, and must-pay Bond Debt of $25,394.00.  The Accountants then computed the December 2013 Debt Service Coverage Ratio by dividing the December 2013 Cash Flow ($41,920.00) by the December 2013 must-pay Bond Debt ($25,394.00), to arrive at an December 2013 Debt Service Coverage Ratio of 1.65 to 1.00.

110.    As of December 31, 2013 Water Tower Place had actual rent levels and operating expenses that produced a Debt Service Coverage Ratio of greater than 1.15 to 1.00 for each of three (3) consecutive months, *to wit*, October 2013, November 2013, and December 2013.

111.    Water Tower Place attained Rental Achievement on December 31, 2013.

112.    Water Tower Place attained the Rental Achievement Test on December 31, 2013.

113.    As a result of the Partnership attaining Rental Achievement and the Rental Achievement Test on December 31, 2013, the Sunset Date is December 31, 2016.

114.    All conditions to the State Limited Partner's obligation to make the State Limited Partner Contribution under LPA Article 3.3.B.(vii) have been materially satisfied.

115.    With respect to the conditions for the State Limited Partner Contribution payable under LPA Article 3.3.B.(viii) in the amount of $231,391.00, that contribution is payable upon the last to occur of (a) satisfaction of all conditions precedent to the payment set forth in LPA Articles 3.3.B.(i), (ii), (iii), (iv), (v), (vi), and (vii); (b) Rental Achievement; (c) issuance of

24

Forms 8609 for Water Tower Place or each building thereof, as applicable; (d) delivery to the Limited Partners of the Partnership's tax return and Schedule K-1 thereto for the first year of the Credit Period; and (e) December 1, 2008. Up to $68,088.00 of those funds are earmarked to pay the Development Fee. As alleged herein, the Partnership satisfied both conditions (a) and (b) above on or before December 31, 2013. Condition (e) has been satisfied by the passage of time.

116. On or before December 31, 2013 the Partnership issued and delivered to the Limited Partners Forms 8609 for Water Tower Place or each building thereof, as applicable, satisfying condition (c) set forth above on or before December 31, 2013.

117. On or before December 31, 2013 the Partnership issued and delivered to the Limited Partners the Partnership's tax return and Schedule K-1 for the first year of the Credit Period, satisfying condition (d) set forth above on or before December 31, 2013.

118. All conditions precedent to the State Limited Partner's obligation to make the State Limited Partner Contribution under LPA Article 3.3.B.(viii) have been materially satisfied.

119. As a result of the satisfaction of the foregoing conditions, State Limited Partner Contributions totalling no less than $290,291.00 are due and payable to the Partnership.

120. With respect to the conditions for the Investor Limited Partner Contribution payable under LPA Article 3.4.G. in the amount of $147,000 that contribution is payable upon the last to occur of (i) satisfaction of all conditions precedent to the payment set forth in LPA Articles 3.4.A., B., C., D., and E.; (ii) attainment of the Rental Achievement Test; and (iii) November 10, 2008. Condition (iii) has been satisfied by the passage of time.

121. Each of the conditions to the payment set forth in set forth in LPA Articles 3.4.A., B., C., D., and E. occurred and/or were satisfied on or before December 31, 2008. Upon the satisfaction of those conditions, the Investor Limited Partner paid the Investor Limited Partner Contributions due under LPA Articles 3.4.A., B., C., D., and E., in a total amount, after

25

adjustments, of $3,995,902.00. Accordingly, the LPA Article 3.4.G.(i) condition occurred and/or is satisfied.

122. Water Tower Place attained the Rental Achievement Test on December 31, 2013. Accordingly, the LPA Article 3.4.G.(ii) condition occurred and/or is satisfied.

123. All conditions to the Investor Limited Partner's obligation to make the Investor Limited Partner Contribution under LPA Article 3.4.G have been materially satisfied.

124. With respect to the conditions for the Investor Limited Partner Contribution payable under LPA Article 3.4.H. in the amount of $578,474 that contribution is payable upon the last to occur of (i) satisfaction of all conditions precedent to the payment set forth in LPA Article 3.4. A., B., C., D., E., and F.; (ii) Rental Achievement; (iii) issuance of Forms 8609 for Water Tower Place or each building thereof, as applicable; (iv) delivery to the Limited Partners of the Partnership's tax return and Schedule K-1 thereto for the first year of the Credit Period and (v) December 10, 2008. Up to $170,186.00 of those funds are earmarked to pay the Development Fee. As alleged herein, the Partnership satisfied conditions (i), (ii), (iii), and (iv) above on or before December 31, 2013. Condition (v) has been satisfied by the passage of time.

125. All conditions to the Investor Limited Partner's obligation to make the Investor Limited Partner Contribution under LPA Article 3.4.H have been materially satisfied.

126. As a result of the satisfaction of the foregoing conditions, Investor Limited Partner Contributions totalling no less than $725,474.00 are due and payable to the Partnership.

127. The total Capital Contributions due and payable by the Limited Partners to the Partnership is no less than $1,015,765.00.

**F.     Alliant Causes the Limited Partners to Breach the LPA**

128. On January 11, 2016 and January 13, 2016 the Partnership, by and through the General Partner, wrote Alliant and the Limited Partners to notify them that all conditions to their

26

payment of the final Limited Partners' Capital Contributions due under LPA Articles 3.3.B. and 3.4. were satisfied, provided Alliant and the Limited Partners with certain additional information extraneous to their obligations to pay those Capital Contributions, requested payment of the final Capital Contributions due under LPA Articles 3.3.B. and 3.4., and reminded Alliant and the Limited Partners of their obligation to pay, or to specify any deficiencies within twenty (20) days thereof.

129.   On January 22, 2016 Mr. Bachman wrote to the Partnership in response to its prior correspondence and the Alliant and the Limited Partners' default on the payment of the Limited Partners' Capital Contributions.  In his letter, authored and published on stationary bearing the Alliant logo, and over the corporate name of Alliant Asset Management, Mr. Bachman stated that Alliant challenged only the Partnership's position that Water Tower Place had attained Rental Achievement, a challenge he made without support, corroboration, or analysis.  Despite the LPA requirements that Alliant and the Limited Partners do so, Mr. Bachman did not raise any other actual or alleged deficiencies.

130.   On January 26, 2016 the Partnership, by and through its counsel, wrote Alliant and the Limited Partners to provide all deliverables required for a Subsequent Closing for Alliant and the Limited Partners to make payment of their final Capital Contributions under LPA Articles 3.3.B. and 3.4., despite a Subsequent Closing not being required by the LPA.  Counsel to the Partnership scheduled that Subsequent Closing for 10:00 a.m. local time on February 16, 2016 at certain specified offices in Chesterfield, Missouri.  The Partnership and the General Partner were ready, willing, and able to appear at that Subsequent Closing to deliver the originals of the Subsequent Closing Documents.

131.    Thereafter, Alliant and the Limited Partners informed the Partnership by and through its counsel and/or consultants, that neither Alliant nor the Limited Partners would attend the February 16, 2016 Subsequent Closing.

132.    On March 28, 2016 Brian Goldberg, President of Alliant Capital, Inc., wrote to the General Partner in response to the prior Partnership demands and correspondence concerning the Alliant and the Limited Partners' default on the payment of the Limited Partners' Capital Contributions.  In his letter, authored and published on stationary bearing the Alliant logo, and over the corporate name of Alliant Asset Management, Mr. Goldberg revealed his knowledge of the various conditions to the Limited Partners' Capital Contributions being due and payable, yet challenged in the most unsubstantiated of fashions only the Partnership's position that Water Tower Place had satisfied the conditions of attaining Rental Achievement, and the Rental Achievement Test.

133.    While Alliant's March 28, 2016 letter purported to reserve the right to raise additional issues and conditions at that time, the LPA requires Alliant to have raised all actual or alleged deficiencies at that time, lest they be deemed waived.

134.    Upon information and belief, Alliant's and the Limited Partners' cursory, unsubstantiated challenge to the attainment by Water Tower Place of Rental Achievement and the Rental Achievement Test is an unsupported, unsubstantiated pretext not made in good faith for the true purpose of hindering, delaying, and avoiding payment of the Capital Contributions.

135.    At the time that Alliant formulated and conveyed to the Partnership its pretextual reason for refusing to make payment of the Capital Contributions, it was aware, from the 2014/2105 Audit Report and other recent information and data available to them, that Water

Tower Place was suffering from a lack of operating capital, and that the Accountants had expressed doubt about the Partnership's ability to continue as a going concern.

136.    At the time that Alliant formulated and conveyed to the Partnership its pretextual reason for refusing to make payment of the Capital Contributions, it was aware, from the 2014/2105 Audit Report and all prior audit reports and other information and data available to it, that Weismann had been funding the Water Tower Place operating capital shortfalls far in excess of his obligations to Alliant to do so, despite the fact that Alliant has obtained substantial liquidity and consideration for its sale of Housing Tax Credits.

137.    One or all of the Plaintiffs have given all notices to all parties required by the LPA of their request for the payment of the Limited Partners' Capital Contributions that are the subject of this civil action.

138.    One or all of the Plaintiffs have given all demands and notices of default to all parties required by the LPA concerning the payment of the Limited Partners' Capital Contributions that are the subject of this civil action.

139.    All cure periods provided for by the LPA for the payment of the Limited Partners' Capital Contributions that are the subject of this civil action after notice of demand and default have expired without payment being made to the Partnership.

140.    At no time have the Limited Partners, whether separately or together, formally or informally declared or alleged that any of the Plaintiffs are or were in breach of any of their respective obligations either concerning, or related to Water Tower Place or the Partnership.

141.    At no time have the Limited Partners, whether separately or together, commenced any civil actions or other legal proceedings declaring or alleging that any of the Plaintiffs are or

were in breach of any of their respective obligations concerning, or related to Water Tower Place or the Partnership.

142.    At no time has Alliant formally or informally declared or alleged that any of the Plaintiffs are or were in breach of any of their respective obligations concerning, or related to Water Tower Place or the Partnership.

143.    At no time has Alliant commenced any civil actions or other legal proceedings declaring or alleging that any of the Plaintiffs are or were in breach of any of their respective obligations concerning, or related to Water Tower Place or the Partnership.

144.    All events and conditions required by the LPA to the commencement of this civil action, if any, have occurred or otherwise been satisfied.

### *Count I*
### *Declaratory Judgment*
### **(General Partner v. Limited Partners)**

145.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 144 as if the same were fully set forth at length herein.

146.    The LPA and the other agreements identified and required therein constitute a valid, binding, enforceable, and fully-integrated contract between and among the General Partners and the Limited Partners, under which the Developer and Weismann have rights as third party beneficiaries.

147.    The LPA and the other agreements identified and required therein set forth the material terms of the LPA, as well as the parties' LPA rights, duties, and obligations.

148.    At no time did a past or present Limited Partner rescind the LPA.

149.    At no time did the General Partner repudiate or abandon the LPA or any of the other agreements identified and required therein.

150.    In LPA Article 3.13.B. Alliant and the Limited Partners expressly agreed that "[i]n the event a Limited Partner fails to contribute any installment of the its Capital Contribution following full satisfaction of each condition precedent thereto in accordance with the terms of [the LPA], and such failure continues for a period of thirty (30) days after delivery of notice of such failure to the Investor Limited Partner and [State] [sic] Limited Partner, the General Partners may cause the Partnership to pursue all rights and remedies available at law."

151.    In LPA Article 16.13 Alliant and the Limited Partners expressly agreed that "[n]o remedy conferred upon or reserved to the Partnership or any Partner by [the LPA] is intended to be exclusive of any other remedy.  Each and every such remedy shall be cumulative and shall be in addition to any other remedy given to the Partnership or any Partner hereunder or now or hereafter existing at law or in equity or by statute."

152.    In LPA Article 3.13.B. Alliant and the Limited Partners expressly agreed that if a Limited Partner defaults on any LPA obligations, one of the cumulative remedies would be recourse to the defaulting Limited Partner's Interest.

153.    LPA Article 3.8.A. provides both the mechanism and the manifestation of the LPA parties' intent that the Investor Limited Partner's and the State Limited Partner's Interests be reduced when their economic positions under the LPA is improved by changes in circumstances, including, without limitation, failure to pay Capital Contributions when due.

154.    The full amounts of the LPA Article 3.3.B.(vii) and (viii) State Limited Partner Contributions are due and payable to the Partnership.

155.    Alliant and the State Limited Partner have unjustifiably failed, or otherwise refused, despite notice, demand, and the expiration of any applicable cure period, to make full payment to the Partnership of the LPA Article 3.3.B.(vii) and (viii) State Limited Partner Contributions.

156.     Alliant's and the State Limited Partner's failure or refusal to make full payment to the Partnership of the LPA Article 3.3.B.(vii) and (viii) State Limited Partner Contributions while continuing to receive the full economic benefit of Housing Tax Credits has substantially and unfairly improved the State Limited Partner's economic position in derogation of the clear intent of the LPA, for which the General Partner is entitled to a remedy.

157.     Alliant's and the State Limited Partner's failure or refusal to make full payment of the LPA Article 3.3.B.(vii) and (viii) State Limited Partner Contributions has substantially and unfairly impaired the Interest of the General Partner insofar as the General Partner has continued to fund Water Tower Place operating costs without the benefit of the State Limited Partner Contributions, and without receiving an increased allocation of Housing Tax Credits as compensation or restitution.

158.     The full amount of the LPA Article 3.4.G. and H. Investor Limited Partner Contributions are due and payable to the Partnership.

159.     Alliant and the Investor Limited Partner have unjustifiably failed, or otherwise refused, despite notice, demand, and the expiration of any applicable cure period, to make full payment to the Partnership of the LPA Article 3.4.G. and H. Investor Limited Partner Contributions.

160.     Alliant's and the Investor Limited Partner's failure or refusal to make full payment to the Partnership of the LPA Article 3.4.G. and H. Investor Limited Partner Contributions while continuing to receive the full economic benefit of Housing Tax Credits and Losses has substantially and unfairly improved the Investor Limited Partner's economic position in derogation of the clear intent of the LPA, for which the General Partner is entitled to a remedy.

32

161.    Alliant's and the Investor Limited Partner's failure or refusal to make full payment of the LPA Article 3.4.G. and H. Investor Limited Partner Contributions has substantially and unfairly impaired the Interest of the General Partner insofar as the General Partner has continued to fund Water Tower Place operating costs without the benefit of the Investor Limited Partner Contributions, and without receiving an increased allocation of Housing Tax Credits and Losses as compensation or restitution.

162.    The reduction of the respective Interests of the State Limited Partner and the Investor Limited Partner to zero percent (0.00%) each in favor of the General Partner effective as of December 31, 2015, and the allocation of the Investor Limited Partner's and the State Limited Partner's Housing Tax Credits and Losses to the General Partner effective as of December 31, 2015 is a fair and reasonable compensation or restitution.

163.    The General Partner is entitled to a declaratory judgment reducing the respective Interests of the Investor Limited Partner and the State Limited Partner to zero percent (0.00%) each in favor of the General Partner, and allocating the Investor Limited Partner's and the State Limited Partner's Housing Tax Credits and Losses to the General Partner, effective as of December 31, 2015.

### Count II
### Declaratory Judgment
### (Weismann v. Alliant and Limited Partners)

164.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 163 as if the same were fully set forth at length herein.

165.    The payment of the State Limited Partner Contributions when due is a material term of the LPA and the other agreements identified and required therein.

166.    The required State Limited Partner Contributions constitute the material economic consideration provided by the State Limited Partner under the LPA and the other agreements identified and required therein in exchange for valuable Housing Tax Credits.

167.    The payment of the Investor Limited Partner Contributions when due is a material term of the LPA and the other agreements identified and required therein.

168.    The required Investor Limited Partner Contributions constitute the material economic consideration provided by the Investor Limited Partner under the LPA and the other agreements identified and required therein in exchange for valuable Housing Tax Credits and Losses.

169.    Weismann, as surety for the General Partner under the LPA, is a third party beneficiary of the State Limited Partner Contributions and the Investor Limited Partner Contributions.

170.    The non-payment of the State Limited Partner Contributions when due directly and proximately caused the Partnership's Operating Deficits and its need for the Operating Loans funded by Weismann.

171.    It was objectively and subjectively foreseeable that the non-payment of the State Limited Partner Contributions when due would cause Partnership Operating Deficits and its need for Operating Loans funded by the General Partner and Weismann.

172.    The non-payment of the State Limited Partner Contributions when due is a prior material breach by the State Limited Partner and Alliant under the LPA that excuses Weismann from any further performance as a surety, under the LPA or otherwise, for any of the obligations of the Partnership or the General Partner to Alliant or the Limited Partners, effective as of December 31, 2015.

173.     The non-payment of the Investor Limited Partner Contributions when due directly and proximately caused the Partnership's Operating Deficits and its need for the Operating Loans funded by Weismann.

174.     It was objectively and subjectively foreseeable that the non-payment of the Investor Limited Partner Contributions when due would cause Partnership Operating Deficits and its need for Operating Loans funded by the General Partner and Weismann.

175.     The non-payment of the Investor Limited Partner Contributions when due is a prior material breach by the Investor Limited Partner and Alliant under the LPA that excuses Weismann from any further performance as a surety, under the LPA or otherwise, for any of the obligations of the Partnership or the General Partner to Alliant or the Limited Partners, effective as of December 31, 2015.

176.     Under the express terms of the LPA and the other agreements identified and required therein, all Weismann's obligations as surety for the General Partner under the LPA expire and are discharged on the Sunset Date.

177.     Weismann is entitled to a declaratory judgment excusing him from any further performance as a surety, under the LPA or otherwise, for any of the obligations of the Partnership or the General Partner to Alliant or the Limited Partners, effective as of December 31, 2015.

178.     In the alternative, Weismann is entitled to a declaratory judgment excusing him from any further performance as a surety, under the LPA or otherwise, for any of the obligations of the Partnership or the General Partner to Alliant or the Limited Partners, effective as of December 31, 2016.

### Count III
### Breach of Contract

**(Plaintiffs v. Limited Partners)**

179.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 178 as if the same were fully set forth at length herein.

180.    Alliant and the Administrative Limited Partner failed, or otherwise refused to genuinely, earnestly, and fairly review and assess the Partnership's submissions of information substantiating the attainment of Rental Achievement and the Rental Achievement Test on December 31, 2013 as determined by the Accountants.

181.    In an effort to hinder, delay, and avoid the payment of the Limited Partners' Capital Contributions, Alliant and the Administrative Limited Partner proffered pretextual challenges, and demanded unreasonable factual data and information above and beyond that required under the LPA, or of the Partnership or the General Partner.

182.    Alliant and the Limited Partners did not act or otherwise exercise the Limited Partner LPA decision-making authority or discretion in good faith concerning the attainment of Rental Achievement and the Rental Achievement Test on December 31, 2013, or the payment of the Limited Partners' Capital Contributions.

183.    Alliant and the State Limited Partner have unjustifiably failed, or otherwise refused, despite notice, demand, and the expiration of any applicable cure period, to make full payment to the Partnership of the LPA Article 3.3.B.(vii) and (viii) State Limited Partner Contributions.

184.    Alliant and the Investor Limited Partner have unjustifiably failed, or otherwise refused, despite notice, demand, and the expiration of any applicable cure period, to make full payment to the Partnership of the LPA Article 3.4.G. and H. Investor Limited Partner Contributions.

185.    The foregoing acts and omissions of Alliant and the Administrative Limited Partner constitute one or more material breaches of the LPA that have directly and proximately caused the Plaintiffs to suffer damages in an amount to be determined by the trier of fact after a trial on the merits.

186.    The foregoing acts and omissions of Alliant and the State Limited Partner constitute one or more material breaches of the LPA that have caused the Plaintiffs to suffer damages in an amount to be determined by the trier of fact after a trial on the merits.

187.    The foregoing acts and omissions of Alliant and the Investor Limited Partner constitute one or more material breaches of the LPA that have directly and proximately caused the Plaintiffs to suffer damages in an amount to be determined by the trier of fact after a trial on the merits.

188.    The foregoing acts and omissions of Alliant in the stead of the Limited Partners constitute one or more material breaches of the LPA that have directly and proximately caused the Plaintiffs to suffer damages in an amount to be determined by the trier of fact after a trial on the merits.

*Count IV*
*Material Breach*
**(Weismann v. Alliant and Limited Partners)**

189.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 188 as if the same were fully set forth at length herein.

190.    The prior material breaches of the LPA and the other agreements identified and required therein by the Administrative Limited Partner excuse Weismann from any further performance as a surety, under the LPA or otherwise, for any of the obligations of the

Partnership or the General Partner to Alliant or the Limited Partners, effective as of December 31, 2015.

191.    The prior material breaches of the LPA and the other agreements identified and required therein by the State Limited Partner excuse Weismann from any further performance as a surety, under the LPA or otherwise, for any of the obligations of the Partnership or the General Partner to Alliant or the Limited Partners, effective as of December 31, 2015.

192.    The prior material breaches of the LPA and the other agreements identified and required therein by the Investor Limited Partner excuse Weismann from any further performance as a surety, under the LPA or otherwise, for any of the obligations of the Partnership or the General Partner to Alliant or the Limited Partners, effective as of December 31, 2015.

193.    The prior material breaches of the LPA and the other agreements identified and required therein by Alliant in the stead of the Limited Partners excuse Weismann from any further performance as a surety, under the LPA or otherwise, for any of the obligations of the Partnership or the General Partner to Alliant or the Limited Partners, effective as of December 31, 2013.

### Count V
### *Breach of Implied Covenant of Good Faith and Fair Dealing*
### (Plaintiffs v. Limited Partners)

194.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 193 as if the same were fully set forth at length herein.

195.    In making its LPA decisions, the Administrative Limited Partner exercised one or more judgments conferred by the express terms of the LPA in such a manner as to evade the spirit of the LPA transactions, and to deny the Plaintiffs their expected LPA benefits.

196.    The decisions made by the Administrative Limited Partner, and the judgments it exercised under the LPA were not exercises of legitimate business judgment, but rather were

made and were exercised in bad faith, and were otherwise so arbitrary, capricious, and pretextual as to amount to an abuse of discretion.

197.   In making its LPA decisions, the State Limited Partner exercised one or more judgments conferred by the express terms of the LPA in such a manner as to evade the spirit of the LPA transactions, and to deny the Plaintiffs their expected LPA benefits.

198.   The decisions made by the State Limited Partner, and the judgments it exercised under the LPA were not exercises of legitimate business judgment, but rather were made and were exercised in bad faith, and were otherwise so arbitrary, capricious, and pretextual as to amount to an abuse of discretion.

199.   In making its LPA decisions, the Investor Limited Partner exercised one or more judgments conferred by the express terms of the LPA in such a manner as to evade the spirit of the LPA transactions, and to deny the Plaintiffs their expected LPA benefits.

200.   The decisions made by the Investor Limited Partner, and the judgments it exercised under the LPA were not exercises of legitimate business judgment, but rather were made and were exercised in bad faith, and were otherwise so arbitrary, capricious, and pretextual as to amount to an abuse of discretion.

201.   In making its Limited Partner LPA decisions, Alliant exercised one or more judgments conferred upon the Limited Partners by the express terms of the LPA in such a manner as to evade the spirit of the LPA transactions, and to deny the Plaintiffs their expected LPA benefits.

202.   The decisions Alliant made in the stead of the Limited Partners, and the judgments it exercised in the stead of the Limited Partners under the LPA were not exercises of

legitimate business judgment, but rather were made and were exercised in bad faith, and were otherwise so arbitrary, so capricious, and so pretextual as to amount to an abuse of discretion.

203.    The Administrative Limited Partner's decisions made under the LPA, and the Administrative Limited Partner's judgments exercised under the LPA constituted breaches of the covenant of good faith and fair dealing that directly and proximately caused the Plaintiffs to suffer damages in an amount to be determined by the trier of fact after a trial on the merits.

204.    The State Limited Partner's decisions made under the LPA, and the State Limited Partner's judgments exercised under the LPA constituted breaches of the covenant of good faith and fair dealing that directly and proximately caused the Plaintiffs to suffer damages in an amount to be determined by the trier of fact after a trial on the merits.

205.    The Investor Limited Partner's decisions made under the LPA, and the Investor Limited Partner's judgments exercised under the LPA constituted breaches of the covenant of good faith and fair dealing that directly and proximately caused the Plaintiffs to suffer damages in an amount to be determined by the trier of fact after a trial on the merits.

206.    Alliant's decisions made under the LPA in the stead of the Limited Partners, and Alliant's judgments exercised in the stead of the Limited Partners under the LPA constituted breaches of the covenant of good faith and fair dealing that directly and proximately caused the Plaintiffs to suffer damages in an amount to be determined by the trier of fact after a trial on the merits.

### Count VI
### *Tortious Interference With Contractual Relations*
### (Developer and Weismann v. Alliant)

207.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 206 as if the same were fully set forth at length herein.

208.    When the Developer entered into the Development Services Agreement it knew Alliant had extensive experience in, and had engaged in a significant number of transactions involving affordable housing projects like Water Tower Place.

209.    When the Developer entered into the Development Services Agreement, it knew of the LPA terms, including, without limitation, the terms requiring payments of the Limited Partner Capital Contributions, and the LPA terms earmarking those funds for the Development Fee.

210.    In agreeing to the Development Services Agreement, the Developer specifically relied upon Alliant's experience with affordable housing projects like Water Tower Place.

211.    In agreeing to the Development Services Agreement, the Developer specifically relied upon the LPA terms, including, without limitation, the terms requiring payments of the Limited Partner Capital Contributions, and the LPA terms earmarking those funds for the Development Fee.

212.    At the time Weismann agreed to be a surety in connection with Water Tower Place, he knew Alliant had extensive experience in, and had engaged in a significant number of transactions involving affordable housing projects like Water Tower Place, and the syndication and sale of Housing Tax Credits.

213.    At the time Weismann agreed to be a surety in connection with Water Tower Place, he knew of the LPA terms, including, without limitation, the terms requiring payments of the Limited Partner Capital Contributions.

214.    In making his decision to be a surety in connection with Water Tower Place, Weismann specifically relied upon Alliant's experience with affordable housing projects like Water Tower Place, and the syndication and sale of Housing Tax Credits.

41

215.    In making his decision to be a surety in connection with Water Tower Place, Weismann specifically relied upon the LPA terms, including, without limitation, the terms requiring payments of the Limited Partner Capital Contributions.

216.    The LPA parties entered into the LPA contemporaneously, or substantially contemporaneously with the the Developer entering into the Development Services Agreement with the Partnership.

217.    The Development Services Agreement constitutes a valid, binding, enforceable, and fully integrated contract between the Developer and the Partnership pursuant to which the Developer had a valid business expectancy of payment of money in exchange for services to be performed by the Developer.

218.    When the LPA parties entered into the LPA, Alliant and its Special Purpose Entities had actual knowledge of the existence of the Development Services Agreement, and that the Developer had a valid business expectancy therein.

219.    The LPA parties entered into the LPA contemporaneously, or substantially contemporaneously with Weismann executing certain guaranty instruments undertaking certain surety obligations for the Bond Debt and under the LPA.

220.    The LPA constitutes a valid, binding, enforceable, and fully integrated contract pursuant to which Weismann, by and through the Developer and the General Partner, had valid business expectancies.

221.    When the LPA parties entered into the LPA, Alliant and its Special Purpose Entities had actual knowledge of the existence of Weismann's interest in the Developer and his rights and interests in the LPA, and that Weismann had valid business expectancies thereunder.

42

222.   By intentionally causing the State Limited Partner to unjustifiably fail, or otherwise refuse, despite notice, demand, and the expiration of any applicable cure period, to make full payment to the Partnership of the LPA Article 3.3.B.(vii) and (viii) State Limited Partner Contributions, Alliant, without justification, intentionally interfered with, and induced the breach by the State Limited Partner of its LPA performance.

223.   By intentionally causing the Investor Limited Partner to unjustifiably fail, or otherwise refuse, despite notice, demand, and the expiration of any applicable cure period, to make full payment to the Partnership of the LPA Article 3.4.G. and H. Investor Limited Partner Contributions, Alliant, without justification, intentionally interfered with, and induced the breach by the Investor Limited Partner of its LPA performance.

224.   Alliant's intentional interference with, and inducement of the breach by the State Limited Partner of its LPA performance directly and proximately caused the Developer and Weismann to suffer damages in an amount to be determined by the trier of fact after a trial on the merits.

225.   Alliant's intentional interference with, and inducement of the breach by the Investor Limited Partner of its LPA performance directly and proximately caused the Developer and Weismann to suffer damages in an amount to be determined by the trier of fact after a trial on the merits.

### Count VII
### Equitable Contribution/Unjust Enrichment
### (Weismann v. Defendants)

226.   The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 225 as if the same were fully set forth at length herein.

227.   The Limited Partners are obligors under the LPA for the payment of numerous financial contributions to the Partnership.

228.    By virtue of its relationship to, and its complete control over and domination of the Limited Partners and their finances and business affairs, Alliant is an obligor under the LPA for the payment of numerous financial contributions to the Partnership.

229.    The financial contributions to the Partnership for which the Limited Partners are obligors are specifically denominated for, and were to be available to pay one or more of the Partnerships debts and operating expenses.

230.    The financial contributions to the Partnership for which Alliant is an obligor are specifically denominated for, and were to be available to pay one or more of the Partnerships debts and operating expenses.

231.    By virtue of one or more of its LPA obligations, the General Partner was a co-obligor with the Limited Partners for the funding to the Partnership of the amounts needed for the Partnership to to pay one or more of its debts and operating expenses in the absence of the Limited Partners making their financial contributions.

232.    By virtue of one or more of its LPA obligations, the General Partner was a co-obligor with Alliant for the funding to the Partnership of the amounts needed for the Partnership to to pay one or more of its debts and operating expenses in the absence of the Alliant making its financial contributions.

233.    By virtue of Weismann standing as a limited surety for certain General Partner obligations under the LPA, Weismann was a limited co-obligor with the Limited Partners for the funding to the Partnership of the amounts needed for the Partnership to to pay one or more of its debts and operating expenses in the absence of the Limited Partners making their financial contributions.

234.    By virtue of Weismann standing as a limited surety for certain General Partner obligations under the LPA, Weismann was a limited co-obligor with Alliant for the funding to the Partnership of the amounts needed for the Partnership to to pay one or more of its debts and operating expenses in the absence of Alliant making its financial contributions.

235.    Weismann has funded in excess of $500,000.00 of Operating Deficits through General Partner Operating Loans to the Partnership, notwithstanding that his obligation to do so was limited to $500,000.00.

236.    Weismann's funding in excess of $500,000.00 of Operating Deficits through General Partner Operating Loans to the Partnership was the direct and proximate result of the Limited Partners failing, or otherwise refusing to make their contractual financial contributions to the Partnership.

237.    Weismann's funding in excess of $500,000.00 of Operating Deficits through General Partner Operating Loans to the Partnership was the direct and proximate result of Alliant failing, or otherwise refusing to make its contractual financial contributions to the Partnership.

238.    Weismann has funded more than his share of the financial contributions due to the Partnership to the benefit of the Limited Partners.

239.    Weismann has funded more than his share of the financial contributions due to the Partnership to the benefit of Alliant.

240.    The Limited Partners have been unjustly enriched as a result of Weismann having funded Operating Loans to the Partnership.

241.    Alliant has been unjustly enriched as a result of Weismann having funded Operating Loans to the Partnership.

242.    Weismann is entitled to equitable contribution and restitution from the Limited Partners for all amounts he funded as Operating Loans in excess of $500,000.00.

243.    Weismann is entitled to equitable contribution and restitution from Alliant for all amounts he funded as Operating Deficits through General Partner Operating Loans in excess of $500,000.00.

## Count VIII
### Punitive Damages
**(Plaintiffs v. Defendants)**

244.    The Plaintiffs repeat and incorporate by reference the allegations in Paragraphs 1 through 243 as if the same were fully set forth at length herein.

245.    Despite their denial that Water Tower Place attained Rental Achievement and the Rental Achievement Test on December 31, 2013, the Limited Partners and Alliant affirmatively assert that the Investor Limited Partner is and has been entitled to the Asset Management Fee since 2008.

246.    Despite their denial Water Tower Place attained Rental Achievement and the Rental Achievement Test on December 31, 2013, the Limited Partners and Alliant invoiced the Partnership for the Asset Management Fee for fiscal year 2008, and all years thereafter, including 2016.

247.    Under the express terms of the LPA, the Asset Management Fee is not due until the attainment of Rental Achievement and the Rental Achievement Test.

248.    At all relevant times, the Limited Partners and Alliant had actual knowledge that under the express terms of the LPA the Asset Management Fee is not due until the attainment of Rental Achievement and the Rental Achievement Test.

249.    The Accountants reported in the 2014/2015 Partnership audit report that the Partnership expects Housing Tax Credits to be claimed by the Partnership in 2016, 2017, and

2018 to total only $813,010.00. Alliant, through Fund 36 Ltd. as the Limited Partners, is to receive all of those State Housing Tax Credits, and substantially all of those Federal Housing Tax Credits in those fiscal years.

250. The absence of the Limited Partners' Capital Contributions have impaired the Partnership's ability to optimally maintain and operate Water Tower Place, which by extension has directly and proximately impaired Water Tower Place Occupancy and Cash Receipts, and contributed to the continuation of Losses from which Alliant benefits.

251. Upon information and belief, Alliant determined that the value of the Housing Tax Credits to be claimed by the Partnership in the foreseeable future, and by extension the value Alliant will realize from the Partnership in the foreseeable future is outweighed by the amount of the Limited Partners' Capital Contributions that are due and payable to the Partnership.

252. Upon information and belief, Alliant has determined to, or that it will attempt to, require the General Partner, and by extension Weismann, to continue to bear the costs of operating Water Tower Place through the end of the Compliance Period, or beyond, without the benefit of the Limited Partners' Capital Contributions to improve, or attempt to improve the value Alliant will realize from the Partnership through the end of the Compliance Period or beyond.

253. Upon information and belief, Alliant determined that it will, or that it will attempt to, improve its bargaining position with the General Partner, and by extension Weismann, with respect to the payment of the Limited Partners' Capital Contributions by delaying those payments and continuing to burden the General Partner, and by extension Weismann, with the costs of operating Water Tower Place.

47

254.    Upon information and belief, Alliant and the Limited Partner's unjustified and pretextual refusal to pay the Limited Partners' Capital Contributions was intentional, calculated, and contrived for the sole purpose of improving the economic position of Alliant under the LPA at the substantial expense of, and to substantial detriment of the General Partner, the Developer, and Weismann.

255.    Upon information and belief, Alliant and the Limited Partner's unjustified and pretextual refusal to pay the Limited Partners' Capital Contributions was in bad faith, borne of improper motive, and in reckless indifference to the legitimate rights of the General Partner, the Developer, and Weismann.

256.    Alliant's and the Limited Partner's intentional and tortious acts and omissions, and duplicitous statements and conduct with respect to the attainment of Rental Achievement and the Rental Achievement Test on December 31, 2013 for the purpose of hindering, delaying, and avoiding the payment of the Limited Partners' Capital Contributions were wanton, willful, outrageous, and in reckless disregard for the legitimate rights of the General Partner, the Developer, and Weismann.

257.    Alliant's and the Limited Partner's intentional and tortious acts and omissions, and duplicitous statements and conduct with respect to the unjustified and pretextual refusal to pay the Limited Partners' Capital Contributions were wanton, willful, outrageous, and in reckless disregard for the legitimate rights of the General Partner, the Developer, and Weismann.

258.    As a direct and proximate consequence of Alliant's and the Limited Partners' outrageous, improperly motivated, and reckless conduct, the General Partner, the Developer, and Weismann are entitled to an award of punitive damages, in addition to their simple damages claimed herein.

259.    As a direct and proximate consequence of Alliant's and the Limited Partners' outrageous, improperly motivated, and reckless conduct, and under the terms of the LPA, the General Partner, the Developer, and Weismann are entitled to an award of their attorneys' fees and costs incurred in this civil action, in addition to their simple and punitive damages claimed herein.

**WHEREFORE**, the Plaintiffs demand judgment as follows:

i.      against the Limited Partners and for the General Partner declaring a reduction of the Limited Partners' Interests to zero percent (0.00%) in favor of the General Partner, and allocating the Limited Partners' Housing Tax Credits and Losses to the General Partner, effective as of December 31, 2015;

ii.     against Alliant and the Limited Partners and for Weismann, declaring his excusal from any further performance as a surety, under the LPA or otherwise, for any of the obligations of the Partnership or the General Partner to Alliant or the Limited Partners, effective as of December 31, 2015;

iii.    against the Limited Partners and for the General Partner, the Developer, and Weismann, awarding them damages for the Limited Partners' material breach of the LPA, together with their attorneys' fees and costs as provided for by the LPA, and prejudgment and post judgment interest as allowed by law;

iv.     against Alliant and the Limited Partners and for Weismann, excusing him from any further performance as a surety, under the LPA or otherwise, for any of the obligations of the Partnership or the General Partner to Alliant or the  Limited Partners, due to their prior material breach of the LPA;

v.      against the Limited Partners and for the General Partner, the Developer, and Weismann, awarding them damages for the Limited Partners' breach of the implied covenant of good faith and fair dealing, together with their attorneys' fees and costs as provided for by the LPA, and prejudgment and post judgment interest as allowed by law;

vi.      against Alliant and for the Developer and Weismann, awarding them damages for Alliant's tortious interference with their contractual relations with the Partnership, together with their attorneys' fees and costs and prejudgment and post judgment interest as allowed by law;

vii.      against Alliant and the Limited Partners and for Weismann awarding him an equitable restitution of all amounts funded by him as Operating Loans to the Partnership in excess of $500,000.00, together with his attorneys' fees and costs and prejudgment and post judgment interest as allowed by law;

viii.      against Alliant and the Limited Partners and for the Plaintiffs awarding them punitive damages and attorneys' fees and costs; and

ix.      granting to the Plaintiffs such other and further relief as the Court deems proper and just.

[*Signatures appear on next page.*]

Respectfully submitted,


/s/ Scott K.G. Kozak
Scott K. G. Kozak, #49029MO
ARMSTRONG TEASDALE LLP
770 Forsyth Boulevard, Suite 1800
St. Louis, Missouri 63105-1847
314.259.4714 (Office)
314.552.4804 (Facsimile)
skozak@armstrongteasdale.com


and


Michael J. Fencer, *Pro Hac Vice* (Pending)
Howard P. Blatchford, Jr., *Pro Hac Vice* (Pending)
JAGER SMITH P.C.
One Financial Center
Boston, Massachusetts 02111
(617) 951-0500 (Office)
(617) 951-2414 (Facsimile)
mfencer@jagersmith.com
hblatchford@jagersmith.com

ATTORNEYS FOR PLAINTIFFS NTD I LLC,
NORTH TOWER DEVELOPMENT, LLC, and
PAUL WEISMANN

## VERIFICATION

I, Paul Weismann, do hereby depose and say the following:

1.     I am the sole manager and the majority member of both the General Partner and the Developer.  I am also an individual party to one or more transactions that are the subject matter of this civil action.  In those capacities I am fully familiar with, and if called upon to do so would be competent to testify to, the facts and circumstances set forth herein.

2.     I have personally read the foregoing *Verified Complaint and Jury Demand* and verify that to the best of my knowledge and belief the facts contained and alleged therein are true and correct.

The foregoing is hereby attested to by the undersigned on this $30$ day of July 2016.

_____
Paul Weismann