**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| NTD I, LLC, NORTH TOWER DEVELOPMENT, LLC, and PAUL WEISMANN, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 4:16CV1246 ERW |
| | ) | |
| ALLIANT ASSET MANAGEMENT COMPANY, LLC, ALLIANT CAPITAL, LTD., ALLIANT CREDIT FACILITY ALP, LLC, and ALLIANT TAX CREDIT FUND 36, LTD, and ALLIANT TAX CREDIT 36, LLC., | ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) | |
| ――――――――――――――――――――― | ) | |
| | ) | |
| ALLIANT TAX CREDIT FUND 36, LTD, and ALLIANT TAX CREDIT 36, LLC., | ) ) ) | |
| | ) | |
| Counterclaim Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| NTD I, LLC, PAUL WEISMANN, and WC ORANGE, LLC. | ) ) | |
| | ) | |
| Counterclaim Defendants. | ) | |

**MEMORANDUM AND ORDER**

This matter comes before the Court on Defendants' Motion for Summary Judgment as to

Counts I, II, III, IV, V and VII of Plaintiffs' Complaint [153].

**I.      BACKGROUND**

This litigation originated in the Eastern District of Missouri when NTD I, LLC ("NTD"

and "General Partner"), North Tower Development, LLC, and Paul Weismann ("Weismann")

1

(collectively "Plaintiffs" and "Counterclaim Defendants") filed a complaint on August 1, 2016, asserting various claims against Alliant Asset Management Company, LLC, Alliant Capital, Ltd., Alliant Credit Facility, Ltd., Alliant Credit Facility ALP, LLC, Alliant Tax Credit Fund 36, Ltd., and Alliant Tax Credit 36, LLC (collectively "Defendants" and "Counterclaim Plaintiffs") related to a Limited Partnership Agreement ("LPA") between the parties. ECF 1.

In 2006, Water Tower Place Limited Partnership (the "Partnership") was formed, pursuant to an Amended and Restated LPA, for the general purpose of constructing, rehabilitating, and operating affordable housing apartment units to qualify for federal and state low-income housing tax credits. Water Tower Place is located in Saint Louis, Missouri, and is comprised of 178 residential housing units in 34 buildings. The project was financed by a 2006 issuance of Multifamily Housing Revenue Bonds that provide federal and state low-income housing tax credits. Water Tower Place must meet regulatory provisions through 2020 to remain housing tax credit qualified. Housing tax credits are contingent on Water Tower Place maintaining occupant eligibility, and/or unit gross rent compliance.

The claims asserted by Plaintiffs in their Complaint [1] are: Count I, for declaratory judgment reducing the Alliant Tax Credit Fund 36, Ltd. and Alliant Tax Credit 36, LLC's (collectively "Limited Partners") interests to zero; Count II, for declaratory judgment excusing Weismann from surety obligations; Count III, for breach of contract to recover the Limited Partners' Capital Contributions; Count IV, excusing Weismann from surety obligations due to the Limited Partners' contract breach; Count V, for damages for the Limited Partners' breach of the implied covenant of good faith and fair dealing; Count VI[1], for damages for Defendants'

---

tortious interference with, and their inducement of a contract breach; Count VII, for equitable

contribution and restitution to Weismann; and Count VIII[2], for punitive damages.

Defendants moved to dismiss the lawsuit claiming first, Plaintiffs were the first to breach

and therefore precluded from bringing two claims against Defendants, second, only one Plaintiff

is a party to the LPA and therefore the rest do not have third-party rights to bring an action, third,

Plaintiffs' declaratory relief and equitable claims as well as their tortious interference claims

should be dismissed because a party cannot interfere with contracts to which it is not a party,

fourth, a parent company cannot be held liable for interference with a subsidiary's contract, fifth,

Plaintiffs' claims for monetary damages are precluded by the plain language of the contract, and

finally, punitive damages are not allowed in a breach of contract case. ECF 17, 18. Additionally,

Defendants argued Plaintiffs' jury demand is invalid because they waived their right to a jury

trial in the LPA and Guaranty Agreement contracts. ECF 17, 18. After a hearing, the Court

granted Defendants' Motion to Dismiss as to Count VII and Count VIII of Plaintiffs' Complaint

and granted Defendants' Motion to Strike Plaintiffs' demand for a jury trial. ECF 38.

On March 17, 2017, Defendants answered Plaintiffs' remaining counts and filed a

Counterclaim against Plaintiffs NTD and Weismann alleging first, Counterclaim Defendants

failed to meet Rental Achievement by December 1, 2008 and therefore Counterclaim Plaintiffs

are entitled to declaratory relief, second, alleging a breach of contract and, third, seeking

injunctive relief preventing any further withdrawals from the operating deficit reserve account

without authorization from the Administrative Limited Partner.[3] ECF 41. Counterclaim

Defendants NTD and Weismann answered Counterclaim Plaintiffs' counterclaim on April 4,

2017. ECF 45. On the same day, Counterclaim Plaintiffs moved to join WC Orange, LLC

---

[2] Count VIII has been dismissed by the Court. ECF 38.
[3] The Administrative Limited Partner is Alliant Tax Credit 36, LLC.

("WCO") as a defendant to their Counterclaim seeking declaratory and injunctive relief related to an allegedly improper sale and purchase of the Partnership indebtedness. ECF 46. Counterclaim Defendants did not object to or oppose the joinder of WCO. ECF 49. Accordingly, the Court granted Counterclaim Plaintiffs' Motion for Joinder of WCO on April 25, 2017. ECF 50. Counterclaim Defendant WCO timely answered. ECF 56.

On September 27, 2017, Counterclaim Plaintiffs filed a Second Amended Counterclaim alleging four counts against Counterclaim Defendants including two additional claims for breach of contract, a claim alleging a breach of fiduciary duty, and injunctive relief against all three Counterclaim Defendants related to the purchase of certain indebtedness of the Partnership by WCO without the consent of the Administrative Limited Partner. ECF 72. Counterclaim Defendants timely answered on December 18, 2017. ECF 81, 82.

On December 22, 2017, Counterclaim Defendants moved for an order enforcing a settlement agreement with Counterclaim Plaintiffs alleging the existence of a valid, binding, and enforceable agreement to settle the action which Counterclaim Plaintiffs breached. ECF 83. Counterclaim Plaintiffs filed a Motion in Opposition alleging the agreement term sheet is not a binding settlement agreement because of the amount of undetermined terms absent in the term sheet, and stating the parties were still in negotiations in an attempt to settle the case. ECF 89. Counterclaim Defendants replied arguing, first, the term sheet unambiguously stated all of the enforceable terms, second, the performance of the agreement obligations were not subject to any conditions precedent, and third, the agreement was definite enough for specific performance. ECF 90. Following oral argument on January 30, 2018, the Court denied the Motion to Enforce the settlement. ECF 93.

Counterclaim Plaintiffs then sought leave to file a Third Amended Counterclaim; Counterclaim Defendants did not oppose, and leave was granted by the Court on May 7, 2018. ECF 98, 101-103. Counterclaim Plaintiffs' Third Amended Counterclaim alleged two additional counts from the Second Amended Counterclaim. ECF 104. Counterclaim Plaintiffs asserted the following counterclaims: first, declaratory relief against NTD and Weismann stating they failed to cause Rental Achievement as required under the Limited Partnership Agreement; second, breach of contract and injunctive relief against NTD and Weismann for withdrawing funds from the operating deficit reserve account and the replacement reserve account without the approval of the Administrative Limited Partner; third, breach of contract and injunctive relief against NTD, Weismann, and WCO resulting from the purchase of debts of the Partnership without the consent of the Administrative Limited Partner and WCO is related to the General Partner; fourth, breach of fiduciary duty and injunctive relief against NTD, Weismann, and WCO by allowing, participating in, and facilitating the purchase of the Partnership's debt by WCO; fifth, breach of contract and declaratory relief against NTD and Weismann for failure to repair material deficiencies and/or non-conformities in the physical property of Water Tower Place; and finally, breach of contract and specific performance against NTD and Weismann for failure to pay for any development deficits which are incurred by the partnership prior to rental achievement. ECF 104. Counterclaim Defendants timely answered on May 21, 2018. ECF 111, 112.

Counterclaim Defendants then moved for partial summary judgment on Counts III and IV of the Third Amended Counterclaim on May 8, 2018, alleging the LPA did not prohibit WCO from acquiring the debt in the form of a bond and the Counterclaim Defendants did not owe or breach any fiduciary duty. ECF 105, 107. Counterclaim Plaintiffs filed a Motion in Opposition alleging Section 5.5(B) of the LPA precludes WCO from directly or indirectly purchasing debt

without the consent of the Limited Partners, the General Partner indirectly acquired the mortgage note without the consent of the Limited Partners, and NTD I, LLC and Weismann owe the Limited Partners a fiduciary duty which prevents this type of behavior. ECF 126. On June 29, 2018, the Court heard arguments on Counterclaim Defendants' Motion for Partial Summary Judgment. ECF 144. On July 20, 2018, the Court granted summary judgment as to WCO and NTD as to Count III, and for WCO, NTD, and Weismann as to Count IV. ECF 148.

On May 22, 2018, Counterclaim Plaintiffs moved for a preliminary injunction against Counterclaim Defendants seeking a declaration Weismann and NTD breached fiduciary duties to the Limited Partners, requesting injunctive relief prohibiting WCO from exercising its mortgage rights against Water Tower Place, and imposing a constructive trust upon the mortgage interest. ECF 116, 117. Counterclaim Defendants filed a memorandum in opposition. ECF 123. On June 29, 2018, the Court heard arguments on Counterclaim Plaintiffs' Motion for a Preliminary Injunction.[4] ECF 144. On July 20, 2018, the Court granted Counterclaim Plaintiffs' Motion for a Preliminary Injunction stating the balance of factors weighed in favor of granting the preliminary injunction, and Counterclaim Plaintiffs had shown irreparable harm and a likelihood of success on the merits. ECF 148. Additionally, the Court ordered Counterclaim Plaintiffs to post a bond in the amount of $100,000.00. ECF 148.

On August 10, 2018, Defendants filed the instant Motion for Summary Judgment seeking an order, first, granting summary judgment against Plaintiffs as to Counts I-V and VII in Plaintiffs' Complaint, and second, granting partial summary judgment in favor of Defendants on Plaintiffs' allegations Rental Achievement and the Rental Achievement Test have been met. ECF 153. Plaintiffs filed a Memorandum in Opposition on August 31, 2018. ECF 162. On September

---

[4] On that same day, arguments were also held on Counterclaim Defendants' Motion for Partial Summary Judgment.

14, 2018, Defendants filed a reply to Plaintiffs' Memorandum in Opposition. ECF 171. The Motion for Summary Judgment was heard by the Court on October 30, 2018. ECF 180.

## II.    UNCONTROVERTED FACTS

The admissible evidence in the record, viewed in the light most favorable to the nonmoving party, establishes the following relevant facts.

The Partnership was formed in 2006 for the general purpose of constructing, renovating, rehabilitating, and operating affordable housing apartment units to qualify for federal and state low-income housing credits.[5] ECF No. 155, ¶ 2. The Partnership financed the acquisition and rehabilitation of Water Tower Place by a 2006 issuance of tax-exempt Multifamily Housing Revenue Bonds identified in Schedule A of the LPA to create state and federal low-income tax credits. ECF No. 163, pg. 8 ¶ 4; ECF No. 172, pg. 36 ¶ 4. The Bond obligations constitute "must-pay debt service." ECF No. 163, pg. 8 ¶ 5; ECF No. 172, pg. 36 ¶ 5.

The Amended and Restated Agreement of Limited Partnership of Water Tower Place, LP (the "LPA") is a valid and binding contract. ECF No. 155, ¶ 1. The LPA states the Limited Partners, Alliant Tax Credit Fund 36, Ltd., and Alliant Tax Credit 36, LLC, are obligated to make certain capital contributions upon a number of conditions being met, including Rental Achievement and the Rental Achievement Test. ECF No. 155, ¶ 3.

In October 2013, the Partnership engaged Sherbert Associates, LLC to calculate the Debt Service Coverage Ratio ("DSCR") and the Occupancy of Water Tower Place. ECF No. 155, ¶ 7. Sherbert Associates prepared an Independent Accountants' Report entitled Calculation of Debt Service Coverage Ratio and Occupancy Percentage October 1, 2013 through December 31, 2013 (hereinafter referred to as the "AUP") showing its calculations. ECF No. 155, ¶ 8. The AUP

---

[5] Under Local Rule 7-4.01(E), "[a]ll matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party." Plaintiffs failed to respond to this fact in their response [ECF 163], therefore the Court deems this fact admitted.

states the Occupancy for Water Tower Place was 92% for each of the three months in the AUP. ECF No. 155, ¶ 12. The General Partner sent the AUP to the Limited Partners in early 2014. ECF No. 155, ¶ 17. Plaintiffs rely upon the AUP in claiming Rental Achievement was met. ECF No. 155, ¶ 29. The Limited Partners were not satisfied the AUP demonstrated Rental Achievement or the Rental Achievement Test had been met. [6] ECF No. 155, ¶ 44.

By January 15, 2014, the Limited Partners had in their possession the third-party property manager's monthly financial reports for Water Tower Place for each of October 2013, November 2013, and December 2013. ECF No. 163, pg. 8 ¶ 6; ECF No. 172, pg. 37 ¶ 6. In January 2016, the General Partner sent (via counsel) demand letters for the capital contributions associated with the attainment of the Rental Achievement Test and Rental Achievement, and notice of a subsequent closing. [7] ECF No. 155, ¶ 24.

Rental Achievement as defined by the LPA "means the date that all of the following conditions have been fulfilled: (i) Conversion; (ii) all governmental approvals necessary for Occupancy of all units in the Apartment Complex have been obtained; and (iii) one hundred percent (100%) Occupancy of the Tax Credit Apartment Units and ninety percent (90%) Occupancy of the Apartment Complex has occurred during each of three (3) consecutive months (but no earlier than the three (3) consecutive months immediately preceding Conversion), and which produces a Debt Service Coverage Ratio of 1.15 to 1.00 for each of such three (3) consecutive months." ECF No. 155, ¶ 30.

The Rental Achievement Test as defined by the LPA "means the satisfaction of a level of Occupancy sustained for a period of three (3) consecutive months with actual rent levels and operating expenses which produce a Debt Service Coverage Ratio of 1.15 to 1.00 with respect to

---

[6] Plaintiffs failed to respond to this fact [ECF 163], therefore the Court deems this fact admitted.
[7] Plaintiffs failed to respond to this fact [ECF 163], therefore the Court deems this fact admitted.

all projected permanent financing for each of such three (3) consecutive months." ECF No. 155, ¶ 31.

According to the terms of Exhibit F to the LPA, all 178 units of the Water Tower Place apartment complex are "Tax Credit Apartment Units."[8] ECF No. 155, ¶ 49. For the three months during which Plaintiffs claim Rental Achievement was met (October, November, and December 2013), only "164 Water Tower Place apartment units were occupied, and 14 apartment units were vacant."[9] ECF No. 155, ¶ 50.

Weismann is party to a guaranty agreement (the "Guaranty Agreement").[10] ECF No. 155, ¶ 51. The Guaranty Agreement states Weismann is obligated to fund "Development Deficits under Section 4.2" of the LPA. ECF No. 155, ¶ 52. "Development Deficits" are defined in the LPA to include "any Operating Deficits incurred by the Partnership prior to Rental Achievement." ECF No. 155, ¶ 53. In the LPA, "Operating Deficits" are defined as "the amount by which Cash Receipts is less than the amount necessary to meet all Expenditures . . . ." ECF No. 155, ¶ 54.

At the Partnership closing, the LPA, the Guaranty Agreement, the Development Services Agreement, other Project Documents, and the Low Income Housing Tax Credit Certificate were executed. ECF No. 163, pg. 8 ¶ 1; ECF No. 172, pg. 35 ¶ 1. The signatories on those documents are noted on the documents. ECF No. 163, pg. 8 ¶ 1; ECF No. 172, pg. 35 ¶ 1. At closing, the Development Services Agreement was entered into by the Water Tower Place, LP Partnership and North Tower Development, LLC, an entity which is not a partner in the Partnership. ECF No. 163, pg. 8 ¶ 1; ECF No. 172, pg. 35 ¶ 1.

---

[8] Plaintiffs failed to respond to this fact [ECF 163], therefore the Court deems this fact admitted.
[9] Plaintiffs failed to respond to this fact [ECF 163], therefore the Court deems this fact admitted.
[10] Plaintiffs failed to respond to this fact [ECF 163], therefore the Court deems this fact admitted.

The LPA states "This Agreement, together with the Exhibits and Schedules hereto and the Development Services Agreement, contains the entire understanding between and among the parties and supersedes any prior understandings and agreement." ECF No. 163, pg. 8 ¶ 2; ECF No. 172, pg. 36 ¶ 2. The Limited Partners have never rescinded the LPA. ECF No. 163, pg. 8 ¶ 3; ECF No. 172, pg. 36 ¶ 3.

## I.  STANDARD

A court shall grant a motion for summary judgment only if the moving party shows "there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). By definition, material facts "might affect the outcome of the suit under the governing law," and a genuine dispute of material fact is one "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). If the non-moving party has failed to "make a showing sufficient to establish the existence of an element essential to that party's case, . . . there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322-23.

The moving party bears the initial burden of proof in establishing "the non-existence of any genuine issue of fact that is material to a judgment in his favor." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 273 (8th Cir. 1988). If the moving party meets this initial burden, the non-moving party must then set forth affirmative evidence and specific facts demonstrating a genuine dispute on the specific issue. *Anderson*, 477 U.S. at 250. When the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but, by affidavit and other evidence must set forth specific facts showing a genuine dispute of material

fact exists. Fed. R. Civ. P. 56(c)(1); *Stone Motor Co. v. Gen. Motors Corp.*, 293 F.3d 456, 465 (8th Cir. 2002). The non-moving party must demonstrate sufficient favorable evidence that could enable a jury to return a verdict for it. *Anderson*, 477 U.S. at 249. "If the non-moving party fails to produce such evidence, summary judgment is proper." *Olson v. Pennzoil Co.*, 943 F.2d 881, 883 (8th Cir. 1991).

In ruling on a motion for summary judgment, the Court may not "weigh the evidence in the summary judgment record, decide credibility questions, or determine the truth of any factual issue." *Kampouris v. St. Louis Symphony Soc.*, 210 F.3d 845, 847 (8th Cir. 2000). The Court instead "perform[s] only a gatekeeper function of determining whether there is evidence in the summary judgment record generating a genuine issue of material fact for trial on each essential element of a claim." *Id.* The Court must view the facts and all reasonable inferences in the light most favorable to the nonmoving party. *Reed v. City of St. Charles*, 561 F.3d 788, 790 (8th Cir. 2009).

## II.      DISCUSSION

In their Motion for Summary Judgment on Counts I-V and VII of Plaintiffs' Complaint, Defendants assert four primary arguments. First, Defendants argue Rental Achievement has not been met. Second, they contend Weismann's guaranty obligations are still in place. Third, Defendants claim because Rental Achievement has not been met, Plaintiffs' claims of a breach of an implied covenant of good faith and fair dealing must be dismissed. Finally, Defendants argue Plaintiffs' claims are barred because Plaintiffs materially breached the contract prior to any alleged breaches by the Defendants. After looking at the facts in the light most favorable to the nonmoving party, this motion for summary judgment will be granted in part, and denied, in part.

A.      *Rental Achievement*

Defendants broadly assert the Court should grant summary judgment in favor of them on Counts I-V and VII because all of Plaintiffs' remaining claims rely on the fact the Limited Partners failed to make the required capital contributions upon the attainment of Rental Achievement and the Rental Achievement Test. Defendants argue the report Plaintiffs rely on to show they have met Rental Achievement improperly calculates the DSCR in violation of the plain language of the LPA, and Plaintiffs never met the Occupancy requirements of the LPA and therefore did not attain Rental Achievement.

a.   *Rental Achievement Occupancy requirements were never met.*

Defendants contend the definition of "Occupancy" in the LPA as it pertains to the definition of Rental Achievement is neither ambiguous nor in dispute. Plaintiffs argue the Court can, and should, consider evidence of custom and practice to determine the intent of the LPA contract to determine the definition of Occupancy, because the LPA's definitions are ambiguous and extrinsic evidence should be used to help determine the meaning.

Whether a contract is ambiguous is a question of law. *Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc.,* 171 S.W.3d 70, 73 (Mo. App. 2005). Contract ambiguity is a two-step process where the first step is to determine whether an ambiguity exists by looking at the plain language of the agreement. *ATC Co. v. Myatt*, 389 S.W.3d 732, 737 (Mo. App. 2013), *TAP Pharm. Prod. Inc. v. State Bd. of Pharmacy*, 238 S.W.3d 140, 143 (Mo. banc 2007). "The test to determine whether there is an ambiguity is whether, in the context of the entire agreement, the disputed language is reasonably susceptible of more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person."' *ATC Co.*, 389 S.W.3d at 735 *citing Id.* "An ambiguity must come from within the four corners of the contract;

extrinsic evidence cannot be used to create an ambiguity." *Teets v. American Family Mutual Ins. Co.,* 272 S.W.3d 455, 462 (Mo. App. 2008). If the disputed language "clearly addresses the matter at issue, the inquiry ends." *TAP Pharm. Prod. Inc.*, 238 S.W.3d at 143. "Where the language of a contract is free from ambiguity, its construction is for the court, as a matter of law." *Brittany Sobery Family Ltd. P'ship v. Coinmach Corp.*, 392 S.W.3d 46, 50 (Mo. App. 2013) c*iting Wilson Mfg. Co. v. Fusco,* 258 S.W.3d 841, 844 (Mo. App. 2008).

First, the Court looks to the plain and ordinary meaning of the disputed term to determine whether an ambiguity exists. Article I of the LPA is titled "DEFINED TERMS" and outlines definitions for well over a hundred capitalized terms including Rental Achievement, Occupancy, and Tax Credit Apartment Units. The LPA specifies that when the terms listed in Article I are capitalized anywhere in the LPA, those terms shall have the meaning specified and detailed in Article I. The terms Rental Achievement, Occupancy, and Tax Credit Apartment Units are capitalized and defined terms in Article I and also appear throughout the LPA clauses in dispute. The Court will use capitalized terms according to their specified meaning in Article I according to the instructions in the LPA.

The parties ultimately dispute whether Rental Achievement, a defined term in Article I, has been met. If Rental Achievement has been met, a series of requirements are triggered in the LPA which shift certain financial obligations from Plaintiffs to Defendants. Since Rental Achievement is a defined and capitalized term in Article I, there is no genuine issue of material fact regarding the requirements or definition of Rental Achievement in the LPA.

Rental Achievement is defined in Article I of the LPA as:

> **"Rental Achievement"** means the date that all of the following conditions have been fulfilled: (i) Conversion; (ii) all governmental approvals necessary for Occupancy of all units in the Apartment Complex have been obtained; and (iii) one hundred percent (100%) Occupancy of the Tax Credit Apartment Units and ninety percent (90%) Occupancy of the Apartment Complex has occurred during each of three (3) consecutive months (but no earlier than the three (3) consecutive months immediately preceding Conversion), and which produces a Debt Service Coverage Ratio of 1.15 to 1.00 for each of such three (3) consecutive months.[11] ECF 155, Ex. A, pg. 21.

According to the definition in Article I of the LPA, there are three factors which must be met before Water Tower Place has satisfied Rental Achievement. The only factor in dispute in the instant motion is factor (iii) which requires two conditions to be satisfied. First, Water Tower Place must have "one hundred percent (100%) Occupancy of the Tax Credit Apartment Units and ninety percent (90%) Occupancy of the Apartment Complex has occurred during each of three (3) consecutive months (but no earlier than the three (3) consecutive months immediately preceding Conversion)" and second, "which produces a Debt Service Coverage Ratio of 1.15 to 1.00 for each of such three (3) consecutive months."

There is no genuine issue of material fact as to the definition of Rental Achievement given its plain meaning in the LPA. However, the parties dispute the meaning of the term "one hundred percent "Occupancy"'" as used in part (iii) of the definition. To determine the meaning of "Occupancy" the Court looks to the definition outlined in Article I of the LPA.

---

[11] Article I of the LPA also defines Rental Achievement Test as:
> "**Rental Achievement Test**" means the satisfaction of a level of Occupancy sustained for a period of three (3) consecutive months with actual rent levels and operating expenses which produce a Debt Service Coverage Ratio of 1.15 to 1.00 with respect to all projected permanent financing for each of such three (3) consecutive months. ECF 155, Ex. A, pg. 21.

For the purposes of this Opinion, Rental Achievement Test in capital letters will be used when referring to the definition outlined in the LPA.

Article I of the LPA defines "Occupancy" as:

> **"Occupancy"** means lawful occupancy of apartment units in the Apartment Complex under leases (i) having a term of not less than six months, (ii) under which full rental payments have commenced at rental rates which are (in the case of the Tax Credit Apartment Units) consistent with the definition of "rent restricted unit" under Section 42(g)(2) of the Code, or at such lower rental rates as may be prescribed under any applicable restrictions contained in the Project Documents, but in no event at rates which are less than ninety percent (90%) of the maximum rents which can be charged to tenants of rent restricted units under Section 42(g)(2) (unless any Project Document prescribes a lower rent, in which case at rates which are less than ninety percent (90%) of such lower rents), (iii) to tenants actually occupying the apartment unit other than on a transient basis and who (in the case of the Tax Credit Apartment Units) meet the income requirements of Section 42(g) of the Code and the Project Documents, and (iv) on such other terms as are commercially reasonable and customary under residential apartment leasing practices observed in the area in which the Apartment Complex is located. An apartment unit shall not be considered "Occupied" unless and until each of the foregoing criteria has been complied with. ECF 155, Ex. A, pg. 17.

In order to meet the definition of Occupancy as outlined in Article I of the LPA, the apartment units in Water Tower place must: (i) have a lease of not less than six months; (ii) full rental payments have commenced at rates which are consistent with the requirements of "rent restricted units;" (iii) to tenants who are not transient and who meet the income requirements; and (iv) under other commercially reasonable terms and leasing practices observed in the area. These benchmarks are clearly and specifically defined in the LPA. The capitalized term Tax Credit Apartment Units also appears in the definition of Occupancy, therefore the Court looks at Article I of the LPA to determine its plain meaning and definition.

In Article I of the LPA, "Tax Credit Apartment Units" is defined as:

> **"Tax Credit Apartment Units**" means all of the apartment units in the Apartment Complex which are to be occupied by tenants in a manner which will qualify such units for Housing Tax Credits and which will permit the Partnership to claim an "applicable fraction", pursuant to Section 42(c)(1)(B) of the Code with respect to the Housing Tax Credits, of at least 100%. ECF 155, Ex. A, pg. 22.

It is undisputed all 178 apartment units at Water Tower Place are qualified as Tax Credit Apartment Units. There are zero units in Water Tower Place which fall into a different category of unit including market rate units or leased commercial space.

Plaintiffs contend the term requiring "one hundred percent (100%) Occupancy of the Tax Credit Apartment Units" located in the definition of Rental Achievement is ambiguous and therefore the Court should look to extrinsic evidence, namely an affidavit from Paul Corrigan[12], to inform the intent of the parties by outlining Mr. Corrigan's experiences with the custom and practice of the industry. With the use of this extrinsic evidence, Plaintiffs contend during in the three months during which NTD and Weismann claim Rental Achievement was met, they achieved one hundred percent Occupancy because, based on industry custom and usage, the Occupancy requirement in the definition of Rental Achievement refers only to satisfying the requirement of qualifying the Tax Credit Apartment Units by the Internal Revenue Service.

Upon a plain reading of the LPA, including Article I, it is clear the term "Occupancy" as used in the definition of Rental Achievement refers to "Occupancy," the defined and capitalized term outlined in Article I. The term "Occupancy" is not reasonably susceptible of more than one construction because of the capitalization of the word within the definition. It is clear that the contract intended for the capitalized Occupancy to mean the defined word present in Article I, not a broader definition found in a dictionary or based on custom and practice.

Upon a plain reading of the LPA, Rental Achievement requires one hundred percent of *the* Tax Credit Apartment Units to be occupied according to the defined term "Occupancy" as detailed in the LPA. It is unambiguous that the term "Tax Credit Apartment Units" was intended

---

[12] The affidavit states, in part, "[a]s to Water Tower Place, the 'one hundred percent (100%) Occupancy of Tax Credit Apartment Units' LPA term was met long ago as each and every apartment unit at Water Tower Place has been rented to and Occupied by one or more LIHTC qualified residents." ECF 163-2, pg. 4.

to mean the definition outlined in Article I. The Article I definition in the LPA specifies that Tax Credit Apartment Units are units which are eligible to receive the Housing Tax Credit.

Plaintiffs attempt to create an ambiguity in the reading of the definition of Rental Achievement by using the same affidavit from Mr. Corrigan to assert that the real meaning of Occupancy is rooted in the notion that because Defendants accepted tax returns and K1s, claiming their tax credits, they have, in essence, admitted that one hundred percent of the Tax Credit Apartment Units have been Occupied. The Court disagrees. For the same reasons above, the contract definitions speak for themselves and the Court cannot consider extrinsic evidence to make the terms Occupancy and Tax Credit Apartment Units suddenly ambiguous. *ATC Co.*, 389 S.W.3d at 735 ("An ambiguity must come from within the four corners of the contract; extrinsic evidence cannot be used to create an ambiguity.") [13]

In this instance, Plaintiffs introduction of extrinsic evidence cannot be used to create an ambiguity in the word Occupancy or in Tax Credit Apartment Units. Occupancy is not a disputed term and clearly expresses the requirements for Rental Achievement. Tax Credit Apartment Units are clearly a type of unit which qualifies for the Housing Tax Credit and their certification does not suddenly excuse the Occupancy requirement when it comes to attaining Rental Achievement. Accordingly, "[w]here the language of a contract is free from ambiguity, its construction is for the court, as a matter of law." *Brittany Sobery Family Ltd. P'ship*, 392 S.W.3d at 50 *citing Wilson Mfg. Co.,* 258 S.W.3d at 844.

---

[13] Plaintiffs assert in their Memorandum of Opposition that the Court cannot grant summary judgment on the issue of "Occupancy" because there is a material factual dispute as to which writings constitute the Partnership agreement. The Court disagrees. The Low Income Housing Tax Credit Certification information on the agreed income levels of low-income qualified tenants and the Water Tower Place Credit Determination Letter authorizing Housing Tax Credits is not necessary to determine the definition of "Occupancy" in the LPA because it is undisputed that all of the units in Water Tower Place had been certified as Tax Credit Apartment Units prior to the submission of the October through December 2013 report alleging Rental Achievement had been met. The certification of the units is not at issue, only the number of units that were Occupied under the LPA for the purposes of attaining Rental Achievement.

The Court has determined the definitions of the word Occupancy and Tax Credit Apartment Units in the definition for Rental Achievement are the definitions outlined in Article I of the LPA. Since the definitions have been determined, the Court now looks to the definitions to determine whether Plaintiffs have successfully reached Rental Achievement.

There is no genuine issue of material fact as to all 178 units at Water Tower Place being qualified as Tax Credit Apartment Units. Additionally, there is no genuine issue of material fact as to how many of those 178 units were Occupied by tenants of some kind from October 1, 2013 through December 31, 2013. In their Complaint, Plaintiffs state "during each of October 2013, November 2013, and December 2013, 164 Water Tower Place apartment units were Occupied, and 14 units were vacant. The Accountants then divided the number of Occupied apartment units in October 2013, November 2013, and December 2013 by the total number of apartment units to arrive at a 92% Occupancy percentage for each of those three successive months." ECF 1, ¶ 104. During the three months Plaintiffs contend they met Rental Achievement, only 92% of the apartment units were Occupied. Plaintiffs' 92% Occupancy rate as stated in their Compliant and in the AUP report completed by the accountants at the behest of Plaintiffs, states unequivocally Plaintiffs had not attained Rental Achievement because they could not have had "one hundred percent Occupancy," a requirement to attain Rental Achievement.

The Court finds the requirements of Rental Achievement as well as the definitions of Occupancy and Tax Credit Apartment units are clear from the plain meaning of the LPA and it will not consider extrinsic evidence to create an ambiguity where none exists. Viewing the facts in the light most favorable to the nonmoving party, the Court grants summary judgment as to the issue of whether Rental Achievement had been met and determines Plaintiffs have not met

Rental Achievement using the documentation from October to December 2013 because they did not have one hundred percent Occupancy as required in the LPA.[14]

### b. Improper Calculation of Rental Achievement

Defendants argue summary judgment is proper because Plaintiffs improperly calculated the Debt Service Coverage Ratio for the months of October through December 2013 by including the increases in the balance of an escrow or reserve account as Expenditures and not Cash Receipts, and therefore Plaintiffs did not attain Rental Achievement for those three months. Plaintiffs counter, arguing various terms in the LPA, including Cash Flow, Cash Receipts, Expenditures, and Debt Service Coverage Ratio, which are needed to meet the requirements of Rental Achievement, are ambiguous and a trial is needed for the Court to determine the parties' intent, custom and practice, and understandings and actions as to the requirements of calculating the Debt Service Coverage Ratio in the LPA.

As detailed above, Rental Achievement requires the satisfaction of three requirements, with the third requirement consisting of two parts. The third requirement to attain Rental Achievement includes having one hundred percent Occupancy and a Debt Service Coverage Ratio of 1.15 to 1.00 for three consecutive months. The Court will grant summary judgment as to the issue of Plaintiffs satisfaction of the requirements of Rental Achievement, therefore, the Court does not need to address any potential ambiguities in the Debt to Service Coverage Ratio as Rental Achievement has not been met by Plaintiffs and summary judgment on the failure of Plaintiffs to obtain Rental Achievement will be granted.

---

[14] While the Court has determined Rental Achievement has not been met by Plaintiffs, it cannot dismiss any of Plaintiffs' Counts at this time because the issue of a waiver of Rental Achievement is not fully resolved. At trial, the parties may submit evidence regarding any claims related to Rental Achievement as it pertains to whether Rental Achievement was waived by Defendants. The parties will not be permitted to submit evidence as to whether Rental Achievement, under the plain reading of the definition, had been obtained because the Court has granted summary judgment as to this matter.

c. *Waiver of Rental Achievement*

Plaintiffs argue in their Memorandum in Opposition the Defendants waived Rental Achievement and therefore summary judgment is not proper on the issue of whether the milestone of Rental Achievement has occurred. Defendants counter, arguing there is not even a scintilla of evidence showing the requirement to meet Rental Achievement was waived.

Waiver is "the intentional relinquishment of a known right." *Shahan v. Shahan*, 988 S.W.2d 529, 534 (Mo. 1999) *quoting Brown v. State Farm Mut. Auto. Ins. Co.*, 776 S.W.2d 384, 386-387 (Mo. 1989). "Waiver may be express or it may be implied by conduct that clearly and unequivocally shows a purpose by the insurer to relinquish a contractual right." *Id.*

To support their claim regarding a waiver of the Rental Achievement requirement, Plaintiffs argue Defendants reported to Verizon, the Limited Partner's investor, in quarterly reports for more than ten years Rental Achievement was not met. Additionally, Plaintiffs argue the quarterly reports are evidence of Defendants frequently moving out Plaintiffs' required date for Rental Achievement because the milestone was unimportant to Defendants given the fact Defendants were receiving their tax credits irrespective of Rental Achievement. Plaintiffs assert that Defendants' own admissions state they did nothing to enforce the Rental Achievement date against Plaintiffs and therefore they waived the Rental Achievement requirement.

On the contrary, Defendants argue they requested additional information from Plaintiffs numerous times from 2014 to 2016 to determine whether Rental Achievement had been met. Defendants assert nothing in the timeline of requests for additional information demonstrates an intentional waiver of the requirement for meeting Rental Achievement. Defendants also contend any argument by Plaintiffs pertaining to Rental Achievement listed as a benchmark in the Verizon quarterly report is unfounded because the benchmark was not a deadline, but rather an

estimated date based on the General Partner's information regarding when the Partnership might meet Rental Achievement.

There are genuine issues of material fact related to the circumstances and events which Plaintiffs contend shows Defendants waived the requirement of Rental Achievement. Summary judgment is not proper on the issue of waiver and therefore is denied.[15]

B.   *Weismann's Guaranty Obligations*

In their Motion, Defendants argue summary judgment should be granted in their favor on Counts II, IV, and VII because Weismann has an obligation to continue to fund Development Deficits, including Operating Deficits, irrespective of an alleged cap of $500,000 because the cap only exists as to funds expended following Rental Achievement. Plaintiffs contend Weismann's obligation to fund Operating Deficits does not exceed $500,000, and an ambiguity exists between the Guaranty Agreement and the LPA which would determine the amount of Development Deficits Weismann is obligated to fund under the contract.

Weismann is a signatory to the July 1, 2006 Guaranty Agreement. The Guaranty Agreement states, in part,

> (A) the payment and performance by the General Partners of each and every one of the following obligations under the following provisions of the Partnership Agreement: . . .
>> (v) *the obligation to fund up to $500,000 of Operating Deficits under Section 4.3* and the obligation to cause the Operating Deficit Reserve Account and the Replacement Reserve Account to be funded pursuant to Sections 4.4 and 4.5, respectively;… ECF 165 at Exhibit P (emphasis added).

---

[15] Neither party properly moved for summary judgment on Plaintiffs' claim of a waiver of the requirement of Rental Achievement. "We have repeatedly held that ... a district court commits reversible error when it grants summary judgment on an issue not raised or discussed by the parties*." Liberty Mut. Ins. Co. v. Pella Corp.*, 650 F.3d 1161, 1178 (8th Cir. 2011) *citing Heisler v. Metro. Council,* 339 F.3d 622, 631 (8th Cir.2003); *see* Fed.R.Civ.P. 56(f)(2) (authorizing the district court to grant summary judgment on grounds not raised by a party only after giving notice and a reasonable time to respond). While this issue was raised by Plaintiffs in their Memorandum in Opposition and discussed by Defendants in their reply, the Court will deny summary judgment on the issue of waiver.

Section 4.3 of the LPA, which is referred to in the Guaranty Agreement, exists in Article 4 of the LPA under the subheading "CONSTRUCTION OF THE APARTMENT COMPLEX; DEVELOPMENT DEFICITS; OPERATING DEFICITS; RESERVES." ECF 155 at 39. Section 4.3 is titled "Operating Deficits[16]"outlines the obligations of the General Partners with respect to lending the Partnership any Operating Loans to fund Operating Deficits during the Operating Deficit Guaranty Period. Operating Deficit Guaranty Period is a defined term in Article I of the LPA and is defined as "the period described in the Schedule"[17] during which the General Partners are obligated to fund Operating Deficits."[18] ECF 155 at 17. The Schedule contains an additional definition of "Operating Deficit Guaranty Period" which defines Operating Deficit Guaranty Period as "[t]he period commencing at Rental Achievement and expiring 36 months thereafter." ECF 155 at PageID #:4306.

Plaintiffs argue Weismann discharged his Operating Deficits obligation by making payments in excess of $500,000. Plaintiffs contend Weismann's obligation was discharged because the Guaranty Agreement, which is one of General Partner LPA obligations and not indebtedness, only requires the payment of $500,000. Plaintiffs contend there is an ambiguity between the Guaranty Agreement and the LPA because one has a clear limitation on Operating Deficit liability capped at $500,000, and one has a limitation which is only removed by timing.

Contract ambiguity is a two-step process where the first step is to determine whether an ambiguity exists by looking at the plain language of the agreement. *ATC Co.,* 389 S.W.3d at 737,

---

[16] Section 4.3. Operating Deficits states, in part, "[t]he General Partners hereby jointly and severally covenant to lend to the Partnership any Operating Loans required to fund Operating Deficits incurred by the Partnership during the Operating Deficit Guaranty Period and not obtainable from the Operating Deficit Reserve Account described in Section 4.4. ECF 155 at 40.

[17] "**Schedule**" means the Schedule annexed hereto. ECF 155 at 22. The "Schedule" attached to the LPA is titled "SCHEDULE TO AMENDED AND RESTATE AGREEMENT OF THE LIMITED PARTNERSHIP OF WATER TOWER PLACE, LP." ECF 155 at PageID #:4306.

[18] Under Article I of the LPA, An Operating Deficit is "for any specified period of time, the amount by which Cash Receipts is less than the amount necessary to meet all Expenditures (except for payment of Expenditures payable from Cash Flow in the priorities set forth in Section 9.2A hereof). ECF 155 at 17.

*TAP Pharm. Prod. Inc.,* 238 S.W.3d at 143. "The test to determine whether there is an ambiguity is whether, in the context of the entire agreement, the disputed language "is reasonably susceptible of more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person."" *Id.* "Writings made a part of the contract by annexation or reference are to be considered in determining whether or not it is ambiguous." *J. E. Hathman, Inc. v. Sigma Alpha Epsilon Club*, 491 S.W.2d 261, 264 (Mo. 1973). "Once an ambiguity has been found, the parties' intent can be determined through the use of extrinsic evidence. *Teets*, 272 S.W.3d at 462 *citing* ATC Co., 389 S.W.3d at 735-36. Resolution of an ambiguity through extrinsic evidence is a question of fact to be determined by the finder of fact. *Id.*

It is clear after looking at the plain language of the LPA, the Guaranty Agreement, and the LPA's attached Schedule, the applicability of the $500,000 cap is reasonably susceptible to more than one construction and is therefore ambiguous. Resolution of this ambiguity through extrinsic evidence is a question of disputed fact and is therefore not proper for summary judgment. The Court finds summary judgment is improper with regards to Plaintiff Weismann's obligations to fund deficits because there are genuine issues of material fact. [19]

### a. Unjust Enrichment

Defendants seek summary judgment on Count VII of Plaintiffs' Complaint asserting Defendants have not been unjustly enriched because Rental Achievement has not been met and as a result, Weismann's obligations to fund Operating Deficits are still in place. Plaintiffs argue

---

[19] Plaintiffs' contend in their Memorandum of Opposition that the LPA should be read with the Development Services Agreement to determine what writings constitute the Partnership agreement and they should subsequently be treated as one contract for the purposes of determining when the fee payment trigger occurs. Plaintiffs argue the while the LPA states Rental Achievement is the payment trigger, the Development Services Agreement states the payment trigger is twelve years after the completion of the rehabilitation of the Project. Since twelve years has not passed from the Completion Date in Plaintiffs' Complaint, October 1, 2007, the Court will not make a determination as to which of the documents executed at signing constitute the Partnership agreement.

Weismann is entitled to restitution for unjust enrichment because of his change in position, hardship, the unreasonable delay of the Defendants, and the Defendants' unclean hands and bad faith."

"To establish the elements of an unjust enrichment claim, the plaintiff must prove that (1) he conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances." *Howard v. Turnbull*, 316 S.W.3d 431, 436 (Mo. App. 2010). "Even if a benefit is 'conferred' and 'appreciated,' if no injustice results from the defendant's retention of the benefit, then no cause of action for unjust enrichment will lie." *Id.* "If the plaintiff has entered into an express contract for the very subject matter for which he seeks recovery, unjust enrichment does not apply, for the plaintiff's rights are limited to the express terms of the contract." *Howard*, 316 S.W.3d at 436 citing *Farmers New World Life Ins. Co. v. Jolley*, 747 S.W.2d 704, 707–08 (Mo. App. 1988)

It is not in dispute Plaintiffs and Defendants entered into an enforceable contract. The obligations of both parties lie within the LPA and the Guaranty Agreement, two express contracts between the parties. However, Plaintiff seeks to recover, in the alternative, under the argument Weismann funded costs and operating loans in excess of $500,000 from which Defendants have unjustly benefited. As noted, "[e]ven if a benefit is 'conferred' and 'appreciated, if no injustice results from the defendant's retention of the benefit, then no cause of action for unjust enrichment will lie." *Howard*, 316 S.W.3d at 436 *citing White v. Pruiett*, 39 S.W.3d 857, 863 (Mo. 2001). "Unjust retention of benefits only occurs when the benefits were 'conferred (a) in misreliance on a right or duty; or (b) through dutiful intervention in another's affairs; or (c) under constraint.'" *Howard*, 316 S.W.3d at 436 *citing Graves v. Berkowitz*, 15

S.W.3d 59 (Mo. App. 2000) *quoting Rolla Lumber Co. v. Evans*, 482 S.W.2d 519, 520 (Mo. App. 1972).

As outlined above, Weismann's guaranty obligations under the LPA and the Guaranty Agreement are still in dispute and therefore improper for summary judgment because there are genuine issues of material fact. Additionally, while the Court has determined Rental Achievement has not been achieved because of the failure to achieve one hundred percent Occupancy, the Court has not granted summary judgment on the issue of whether Defendants have waived Rental Achievement. Accordingly, there are genuine issues of material fact as to Plaintiffs' claims for unjust enrichment and therefore summary judgment will be denied.

b. *Equitable Contribution from Alliant as a Co-Obligor*

In this Motion, Defendants argue there is no obligation from any Alliant entity to fund the Partnership and any Operating Deficits. Plaintiffs, in Count VII of their complaint, assert Alliant is an obligor under the LPA for the payment of numerous financial contributions to the Partnership and as a result, Plaintiffs are entitled to an equitable contribution from Defendants as a result of Weismann's funding of debts in excess of $500,000.[20]

"Equitable contribution is the right to recover from a co-obligor who shares liability with the party seeking contribution." *Missouri Pub. Entity Risk Mgmt. Fund v. Am. Cas. Co. of Reading*, 399 S.W.3d 68, 79 (Mo. App. 2013) *citing Heartland Payment Sys., L.L.C. v. Utica Mut. Ins. Co.*, 185 S.W.3d 225, 232 (Mo. App. 2006). The Guaranty Agreement, entered into by Plaintiffs, states the General Partners and not the Alliant entities as Investor Limited Partners have "the obligation to fund up to $500,000 of Operating Deficits under Section 4.3 and the obligation to cause the Operating Deficit Reserve Account and the Replacement Reserve

---

[20] Plaintiffs failed to address any of Defendants' arguments regarding equitable contribution in their Memorandum in Opposition to Defendants' Motion for Summary Judgment.

Account to be funded pursuant to Sections 4.4 and 4.5, respectively." ECF 165 at Exhibit P. Article I of the LPA defines Guaranty Agreement as "the Guaranty Agreement of even date with this Agreement pursuant to which the Guarantors have *guaranteed for the benefit* of the Investor Limited Partner the performance of certain specified obligations of the General Partners hereunder." ECF 155 at 14 (emphasis added).

It is undisputed neither the LPA nor the Guaranty Agreement place any obligation on any Alliant entity to co-fund Operating Deficits. The definition of Guaranty Agreement in the LPA, as well as the Guaranty Agreement itself, clearly detail the obligations Plaintiffs have with respect to the Investor Limited Partner, Alliant, LLC, and do not detail co-obligations they share with regards to funding certain obligations of the General Partners. Viewing the facts in the light most favorable to the nonmoving party, the Court finds there is no dispute of material fact pertaining to any Alliant entity as a co-obligor to Weismann's financial obligations under the LPA and Guaranty Agreement. Equitable contribution is a right to recover against a party who shares liability. In the present case, there are no facts which indicate Defendants' share liability with Plaintiffs as to any financial contributions, and therefore Plaintiffs are not entitled to recovery under the doctrine of equitable contribution.

Viewing the facts in the light most favorable to the nonmoving party, summary judgment is granted for Defendants as to any equitable contribution claim based on any Alliant entity being a co-obligor to Weismann's financial obligations under the LPA and Guaranty Agreement.

C.     *Breach of Implied Covenant of Good Faith and Fair Dealing*

Defendants moved for summary judgment on Count V of Plaintiffs' Complaint arguing Plaintiffs wrongfully claimed Rental Achievement had been met and therefore Defendants could not be held liable for breaching the implied covenant of good faith and fair dealing for failing to

make the final capital contributions which were triggered upon Rental Achievement. Plaintiffs counter, arguing there are genuine issues of material fact as to whether Defendants sought additional information as a follow up to the initial AUP report claiming Rental Achievement as a pretext to avoid payment. Plaintiffs also argue genuine issues of fact exist as to whether Defendants breached the implied covenant of good faith and fair dealing by unjustifiable failing to refusing to utilize information in their possession to make a fair and good faith assessment of the AUP report.

Missouri law implies a covenant of good faith and fair dealing in performance and enforcement in every contract. *Martin v. Prier Brass Manufacturing Co.*, 710 S.W.2d 466, 473 (Mo. App. 1986). "That duty prevents one party to the contract to exercise a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." *Prier Brass Mfg. Co.*, 710 S.W.2d at 473. "The implied duty of one party to cooperate with the other party to a contract to enable performance and achievement of the expected benefits is an enforceable contract right." *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 412 (Mo. App. 2000). "The plaintiff bears the burden of providing substantial evidence to show bad faith on the part of a defendant." *Koger ,* 28 S.W.3d at 412 *citing Morton Hearst Corp.*, 779 S.W.2d 268, 273 (Mo. App. 1986).

Defendants contend Plaintiffs point to zero pieces of evidence which show any acts of bad faith by any of the Defendants with regards to Defendants not making the capital contributions triggered following the attainment of Rental Achievement. Defendants argue since Rental Achievement was not met, the capital contributions were not due, and therefore this issue is proper for summary judgment.

While the Court has granted summary judgment as to the issue of whether Rental Achievement was attained, the implied covenant of good faith and fair dealing does not rest entirely on the resolution of whether Rental Achievement was met based on the LPA's clear definition, but rather on whether Defendants evaded the spirit of the contract as to deny Plaintiffs an expected benefit of the contract.

An implied duty exists in Missouri law for the parties to cooperate throughout the course of a contract to enable performance so each side can get their expected benefits. The facts surrounding the actions of both parties as it relates to the AUP report are still in dispute. Plaintiffs set forth disputed facts alleging Defendants were being opportunistic and exploiting the situation to improve their gains, and Defendants set forth disputed facts alleging Plaintiffs failed to provide the necessary information to verify Rental Achievement.

It is clear to the Court, irrespective of the granting of summary judgment on the non-attainment of Rental Achievement, viewing the facts in the light most favorable to the nonmoving party, there are numerous material facts in dispute which could show Defendants evaded the spirit of the transaction, and therefore denied Plaintiffs the expected benefit of their contract, namely, capital contributions. Accordingly, the Court will deny Defendants' Motion for Summary Judgment on Count V.

D.    *First to Breach*

In their Motion, Defendants argue Plaintiffs failed to meet a material term of the LPA, namely, failing to meet Rental Achievement by December 1, 2008, and therefore are precluded from asserting any of their claims under the "first to breach" rule. Plaintiffs counter, arguing the first to breach rule does not apply because meeting Rental Achievement was not a material term

of the contract and Defendants were not deprived of the reasonably expected benefits of the LPA.

Missouri adheres to the "first to breach" rule, which holds a party to a contract cannot claim its benefit where he is the first to violate it. *R.J.S. Sec., Inc. v. Command Sec. Servs., Inc.*, 101 S.W.3d 1, 18 (Mo. App. 2003). The "determination of the first to breach does not end the analysis, however, as only a material breach may excuse the other party's performance." *Id.* (emphasis added). "Whether a breach is material or not is a question of fact." *Id.* However, even a material breach can be waived by a party's acceptance of defective performance. *Spencer Reed Group, Inc. v. Pickett*, 163 S.W.3d 570, 574 (Mo. App. 2005). A party in breach may also cure the breach by correcting the deficiency in his performance. *Barnett v. Davis*, 335 S.W.3d 110, 113 (Mo. App. 2011).

While the "first to breach" rule would preclude a party from claiming a benefit where they were the first to violate the contract, this doctrine is not proper for summary judgment. Plaintiffs, by their own admission, did not meet Rental Achievement by the December 1, 2008 date in the LPA, however, a dispute exists as to whether the failure to meet Rental Achievement by the 2008 date was a breach material enough to invoke the "first to breach" rule. Viewing the facts in the light most favorable to the nonmoving party, summary judgment is denied.

Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment [153] is **GRANTED, in part,** and **DENIED, in part.**

So Ordered this 23rd day of January, 2019.

_____
**E. RICHARD WEBBER**
**SENIOR UNITED STATES DISTRICT JUDGE**